UNITED STATES of America, Plaintiff–Appellee,

v.

Edwin Dwane RICKETTS and Arthur Lee Jones, Defendants– Appellants.

Nos. 97–3434, 97–3911.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1998.

Decided June 11, 1998.

Richard H. Lloyd (argued), W. Charles Grace, Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Patrick W. Fitzgerald (argued), Alton, IL, for Edwin D. Ricketts.

John Dale Stobbs (argued), East Alton, IL, for Arthur L. Jones.

Before COFFEY, EASTERBROOK, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

Edwin Ricketts and Arthur Jones took part in a riot at the Federal Correctional Institution in Greenville, Illinois, on October

20, 1995. The riot damaged the prison to the tune of $750,000 and displaced 250 inmates for 9 months before the part of the institution that was damaged could be repaired. The riot, which involved nonwhite prisoners, was ostensibly triggered by Congress's refusal to follow a recommendation to eliminate the crack versus powder cocaine sentencing disparity under the federal sentencing guidelines. Another reason for the riot, and perhaps, considering what was said during the fracas, a more likely one, was anger when inmates responded to an unexpected order to "lock down"-that is, go to their cells—20 minutes early. Most of the rioters wore masks. Jones and Ricketts did not.

After order was restored Ricketts and Jones were indicted for conspiracy to riot in a federal prison and for instigating and assisting in a mutiny in a federal prison, both in violation of 18 U.S.C. § 1792. Ricketts was also indicted for assault with a dangerous weapon against correctional officers David Hughes and Donnie Howard in violation of 18 U.S.C. § 111. Jones was indicted for assault with a dangerous weapon against correctional officers Francisco Rivera, Alan Mollett, Sammie Crowell, and Hughes.

A jury convicted Ricketts of conspiracy and mutiny but passed him on the assault charges. Jones was convicted on the conspiracy and mutiny charges and two of the four assault charges. Ricketts drew a 10–year sentence consecutive to the time he owed the government and Jones got the same thing plus an additional 31 months consecutive on the assault charges. Today we consider the defendants' appeals.

During the trial several guards and inmates gave damaging testimony against Ricketts and Jones. Guards testified that Ricketts yelled "We don't have to take this" and "We don't have to take this shit." He yelled out to groups of prisoners "We don't got to lock down" and "Why do we have lock down, fuck this." The jury also heard that Ricketts attempted to debate the lock-down order with one of the guard commanders, telling the officer that the guards would be getting what they deserved. Guards and prisoners testified that Ricketts took part in savage attacks on Hughes and Howard. One

witness testified to seeing Ricketts swinging a table leg at Hughes. Rivera testified that during the riot Ricketts screamed "We're going to take this place, we'll take this stuff" while banging a table leg on the floor.

Ricketts testified that when the riot began he was playing chess. He claimed that one of the guards, after the lock down was ordered, refused to let him into his cell. He explained that the guard ordered a count, not a lock down. He claimed that he sat down and waited by his cell. He denied wielding a table leg and claimed that he aided, but did not attack, Rivera.

As Ricketts confronted the officer and debated the lock-down order, a group of prisoners, with Jones at the fore, charged the guards. According to the witnesses, Jones ran at the guards with a chair and yelled "Let's send them to their deaths" and "Let's get them." Jones struck Crowell in the face, causing extensive injuries. He broke a leg off a table to use as a weapon against Hughes. Both guards and a prisoner testified to Jones' attack on Hughes. A guard testified that Jones attacked Mollett. Rivera testified that Jones charged him, yelling "Let's get over with this shit, we are tired of this changes these mother fuckers, we're going to take this place." Both Rivera and another guard testified that Jones attacked Rivera with a table leg as Rivera attempted to retreat. Jones then dragged Rivera back into the unit where he and other prisoners beat Rivera with their feet, table legs, and broom handles. Jones beat Rivera about the head with a metal chair. Rivera later escaped and Jones began banging on a glass door with a table leg with an exposed bolt. Several guards testified to Jones carrying a table leg· and appearing at the front of groups of inmates.

Jones admitted running toward the staff. He claimed that he picked up a chess table because he thought he "was going to be beaten." He said he picked up a table leg after almost being hit by objects thrown by other inmates. He "guessed" that he was going to hit someone with the table leg, but it slipped out of his hand and hit a corrections officer. Jones claimed that he saw Ricketts help Rivera escape.

In challenging their convictions Ricketts and Jones join hands on a pair of issues, and each raises a few additional issues that relate only to his own appeal. The first joint issue is a claim that the trial judge erred by failing to strike several prospective jurors. The second joint issue relates to some audio tapes, and we quote verbatim Ricketts' counsel's rather lengthy sentence (all 124 words) setting it forth:

> The trial court erred by denying defendant's motion to dismiss, or in the alternative, to suppress testimony by government witnesses, where correctional officers had tape recorded several hours of conversations with the defendant but, when defense counsel sought to listen to the tapes, they were mysteriously blank, and where the court misconstrued defendant's motion as asking the court to suppress the tapes themselves when, in fact, defendant was asking the court to sanction the government for erasing the tapes, and said error was compounded by the court's denial of defendant's motion to obtain the services of an audio expert to determine whether the tapes were blank because they had, in fact, been affirmatively erased, or were simply an innocent malfunction of the recording equipment.

We start with the juror issue. The district judge conducted a general voir dire of the jury panel and then gave each attorney a half an hour to question the pool. During the prosecutor's voir dire the potential jurors were asked whether they had "anything against correctional officers" and whether they had "anything against inmates." Late in voir dire one defense counsel followed up on this line of questioning by asking whether jurors would give more weight to the testimony of a guard than an inmate. Several prospective jurors (Ricketts' brief names seven, but says that nine raised their hands) responded that they would listen more to guards. Two prospective jurors stated that they could not put aside the fact that one person is an inmate and someone else is a guard. As defense counsel continued to explore the subject he was told that only one minute remained on his voir dire time. Defense counsel sought to have these prospec-tive jurors struck for cause. The court refused.

The defendants argue that the judge predicated his refusal to strike the jurors for cause on the abstractness of the questions asked. The judge said, "[Y]ou asked a question based upon an inmate versus a guard, and you don't give them anything else and will you believe an inmate versus a guard or will you believe a guard versus an inmate, that's not enough of a question.... [W]e can't make a determination based upon those two factors alone."

■ The defendants argue that the judge improperly limited voir dire before they could obtain sufficient information to better exercise their challenges. They cite several cases: *United States v. Guy*, 924 F.2d 702, 707 (7th Cir.1991), for the proposition that either the court must make or allow counsel to make sufficient inquiry to ensure an impartial jury; *United States v. McAnderson*, 914 F.2d 934, 942 (7th Cir.1990), for the idea that the court must allow an adequate voir dire for the defense to exercise its peremptory strikes; and *United States v. Moore*, 936 F.2d 1508, 1514 (7th Cir.1991), for the principle that adequate voir dire must provide the defense with enough information to raise a challenge for cause. The defendants argue that this case involved a swearing match between guards and inmates and that their ability to intelligently exercise their challenges-both for cause and peremptory—was impaired by the way the voir dire was conducted.

The government notes in response that the defense wasted a lot of time during its voir dire. The government also implies that there was insufficient inquiry into whether favoring a guard over an inmate would lead any juror to ultimately be unfair or partial. Finally, the government notes that the defendants failed to exercise three of their peremptory challenges and allowed four of the allegedly partial prospective jurors to sit on the jury.

■ We have reviewed the transcript of the voir dire proceedings. Our review leads us to agree with the government that a lot of time was wasted. More importantly, howev-

er, the record is woefully short of establishing support for a factual finding that the questioned jurors were not going to be impartial. In the abstract, it is certainly not unreasonable for an ordinary person to say she would generally tend to believe a prison guard over a prison inmate. But that certainly doesn't mean that in a given case, after hearing sworn testimony under oath and considering all the facts and circumstances, that that same juror would automatically believe a given guard over a given inmate. Generalized questions of the sort asked here are a slim basis upon which to base a challenge for cause. That, coupled with the fact that the defendants did not ask the judge for more time or even use all of their peremptory challenges, relegates this particular citation of error to the meritless file.

Both defendants next argue, as we have quoted verbatim, that the court erred by not dismissing the case, suppressing testimony, or granting a motion for the services of an expert in regard to certain audio tapes made during negotiations to end the riot. This broad argument arises because the government provided "tapes" of the negotiations to end the riot which turned out to be blank. The defense argued that the government must have deliberately erased the tapes. The trial judge denied the various requests because the defense offered no proof of erasure. The defense complains that it could not offer proof of that sort without an expert.

■ The short answer to this argument is that the tapes of the negotiations, even as represented by the defense, could have contained little evidence relevant to the actual charges of conspiracy, riot, and assault. The damning testimony on those offenses related to events that took place before the negotiations. Thus, even if the tapes showed that Ricketts helped negotiate an end to the standoff, his later laudable conduct would not undo his earlier crimes. We find no error in declining the various defense requests and motions regarding the tapes of the negotiations.

■ We now move to a few of the individual issues. Ricketts' counsel sets out one of the issues in a sentence which, rather surprisingly, tops the length of the one he wrote about the tapes. He says:

> The trial court erred by denying defendant's ex parte motion to obtain the services of a medical expert after a government witness had testified at trial that he suffered from recurrent flashbacks and that his wife did not want to sleep with him because he flailed his arms during his sleep as a result of the alleged criminal conduct of the defendant and where the expert would have testified that the witness could have problems with the encoding, storage, and retrieval of memories and could include constructive/schematic distortion processes, and said error by the trial court was later compounded by the court when it denied defendant the opportunity to sufficiently inquire into these issues of an expert who was called to testify on behalf of the co-defendant.

We gather here that Ricketts claims that the district judge erred by denying him the services of an expert, Dr. Dan Cuneo, to impeach the testimony of correctional officer Pat Crowley. Crowley testified that he suffered from "flashbacks" of the riot and from nightmares. Ricketts filed an *ex parte* motion to obtain the services of Cuneo (already in the case on another issue) as a mental health expert to testify that Crowley's memories of Ricketts could be the product of "constructive/schematic distortion processes." Ricketts explains that Crowley's testimony was particularly damaging because he was the only guard who remembered him from the riot without looking at photographs, and because he was the only guard who said Ricketts argued with the commander (rather than just conversed with him) about the lock down. Ricketts also protests the court's decision to limit his cross-examination of Cuneo, who testified on an unrelated issue. The court ruled that pursuing the medical theory he wanted to advance on cross was beyond the scope of direct and, on top of that, irrelevant.

■ We review the decision to exclude evidence for an abuse of discretion and, on this point, we think the district judge made the right call. An excursion into murky opinion testimony about something as esoter-

ic sounding as "constructive/schematic distortion process" is a road better left untraveled. And beyond that, we don't think Dr. Cuneo's testimony was necessary for Ricketts to suggest to the jury that the stress of the riot might have affected the accuracy of Crowley's memory about what occurred. And finally, even if someone could contort error out of the rejection of the evidence, we think it would be harmless beyond any doubt given the strong evidence of Rickett's guilt that was presented to the jury. *See United States v. Vest*, 116 F.3d 1179, 1188–89 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1058, 140 L.Ed.2d 120 (1998) (exclusion of mental health expert testimony concerning witness memory not reversible error).

■ Ricketts also complains that the court improperly refused to allow him to present as evidence a written report of his interview with an FBI agent. The argument is that at the close of his evidence-and at the end of the day—Ricketts' counsel told the court that he needed a moment to make sure he had moved the admission of all documents before resting. The judge told him that he could do it later. The next morning the parties proceeded immediately to an instruction conference. Afterwards, Ricketts' attorney moved the admission of the FBI report. The court refused to receive it, and Ricketts claims actual prejudice because the jury requested the report during its deliberations.

This argument fails for several reasons. First, Ricketts' counsel extensively examined the agent who conducted the interview and wrote the report, so we fail to see why it was necessary for the report itself to get into evidence. More importantly, because the report was not used to impeach the agent regarding statements made to him by Ricketts, it was really nothing more than a self-serving statement by Ricketts, inadmissible under the rules against hearsay. Given that state of affairs, Ricketts was lucky to get as much of the report before the jury as he did.

■ We move next to Mr. Jones, who claims that the court erred when it closed the door on a diminished capacity defense he hoped to offer. After getting wind of the defense the government filed a motion in limine to prevent Dr. Cuneo from testifying

that Jones could not form the sort of intent necessary to commit the assaults he was charged with due to his condition—post-traumatic stress disorder.

In *United States v. Woody*, 55 F.3d 1257 (7th Cir.1995), we held that Section 111 of Title 18 is a general intent crime. A violation of § 111 requires proof that the defendant intended to commit a forcible assault. *Id.* at 1265–66. "The government may establish proof of a forcible assault by demonstrating that the defendant made 'such a threat or display of physical aggression toward the officers as to inspire fear of pain, bodily harm, or death.'" *Id.* at 1266 (citing *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir.1993), quoting *United States v. Walker*, 835 F.2d 983, 987 (2d Cir.1987)). *See also United States v. Streich*, 759 F.2d 579, 585 (7th Cir.1985) (willfulness is not an element of assault on a federal officer with a dangerous weapon under 18 U.S.C. § 111).

■ Unfortunately, our opinion in *Woody* does not discuss, or acknowledge, *United States v. Staggs*, 553 F.2d 1073 (7th Cir.1977), which held that § 111 was a specific intent crime and that the failure to permit a defendant charged with a specific intent crime to introduce evidence of a character trait that makes it unlikely that he harbored the requisite criminal intent was reversible error. Although we acknowledge the omission, we accept the fact that *Woody* effectively overruled *Staggs* on the point, and we think that position is correct. And we note further that in staying with *Woody* we join other circuits in holding that § 111 is a general intent crime. *See United States v. Kleinbart*, 27 F.3d 586 (D.C.Cir.1994); *United States v. Jim*, 865 F.2d 211 (9th Cir.1989); *United States v. Hill*, 526 F.2d 1019, 1027 (10th Cir.1975), *cert. denied*, 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976). Given this conclusion, there was no error in excluding the planned diminished capacity testimony of Dr. Cuneo. *See United States v. Reed*, 991 F.2d 399, 400 (7th Cir.1993) ("diminished capacity ... is a defense only to specific intent crimes"). Before leaving the issue, however, we note that the district judge seems to have allowed a bit too much testimony from Dr.

Cuneo to be presented to the jury. Diminished capacity, applying as it does only to specific intent crimes, is an extremely limited defense. Intent to commit a crime is almost always a question of fact for the jury to decide based on the life experiences and common sense of its members. Most medical experts, including psychiatrists, are rarely able to make meaningful contributions that can properly guide jurors in this task.

Rule 704(b) of the Federal Rules of Evidence provides:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

As explained by Jones' counsel, Dr. Cuneo's proffered testimony crossed the bounds of appropriate expert testimony because it offered a conclusion as to whether or not "past events" in Jones' life, coupled with his "mental illness," prohibited him from forming the intent to commit the crime. It is clear that counsel desired Dr. Cuneo to testify to the ultimate issue:

> THE COURT: What would Dr. Cuneo's testimony go to, John?
>
> MR. STOBBS (Jones' attorney): I think, Judge, he would go—it would go to the fact that everything-that all of Arthur's—that pre—when he was a young boy, you know, he was abandoned, he was shot at the age of 8, he saw a murder at age 12, and that he has post-traumatic stress syndrome and that when he's in a corner and feels pressure that he snaps out.
>
> THE COURT: And that leads you to what conclusion?
>
> MR. STOBBS: To the conclusion that Arthur could not have had the specific intent to have assaulted the guards, that he couldn't have formed the intent in his mind to assault the guards or to participate in the riot.
>
> THE COURT: Or to participate in a riot.

> MR. STOBBS: Yes, sir.

Notwithstanding the granting of the government's motion in limine, which was correct, Dr. Cuneo was nevertheless still able to get information about Jones' alleged posttraumatic stress disorder and the effect it had on his ability to control his actions before the jury:

(Questions by Mr. Stobbs and answers by Dr. Cuneo)

> Q. You said that Arthur had the ability to control his actions, is that right?
>
> A. That's correct.
>
> Q. All right. Well, what effect did his posttraumatic stress-
>
> MR. LLOYD (the prosecutor): Your Honor, I'm going to object, Your Honor. That goes to an issue under 704(b).
>
> MR. STOBBS: He opened the door, Judge.
>
> THE COURT: The objection is overruled. You may ask the question.
>
> Q. What effect would his post-traumatic stress disorder have on his ability to control his actions at the time the prosecutor's talking to you on October 20, 1995?
>
> A. Well, what happened is he would have been much quicker to react, much quicker to explode. You're talking about a kid who had been dropped off by his mom. He had lived in a house that was riddled by bullets. If all of a sudden somebody tried to pressure him, I expect this would be a guy that would be quick to explode. This was a guy that repeatedly during the course of the time he had been in the different juvenile-

So defense counsel was able to elicit the testimony of Dr. Cuneo on Jones' ability to control his actions on the day of the riot. Our review of the record discloses nothing that really "opened the door" to this testimony by Dr. Cuneo. So it was error (unreviewable, of course, had the jury used it to exonerate Jones) to put Dr. Cuneo's opinion on the point before the jury. Because testimony of this kind has the potential for significant confusion, judges should vigorously police attempts to introduce it during trials.

Finally, it seems no criminal appeal is complete without a sentencing issue, and one is presented here as Jones claims that the court erred by denying him a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). He argues that he admitted his refusal to lock down and his wielding of a table leg. He went to trial only to litigate his diminished capacity defense. Jones argues that he accepted moral responsibility for his actions.

We reject this claim. Acceptance of responsibility under the guidelines is a question of fact for the district court. *See United States v. Reno,* 992 F.2d 739 (7th Cir.1993). We think the district judge's conclusion that Jones was not entirely honest about his conduct during the riot, by itself, is more than enough to support the finding that he did not deserve a guideline reduction for acceptance of responsibility.

AFFIRMED.