**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Leon SMALLWOOD, Defendant–
Appellant.**

**No. 98–3666.**

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1999.

Decided Aug. 26, 1999.

906

Suzanne M. Garrison (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

George Edward Moorman (argued), Williamson, Webster, Groshong & Falb, Alton, IL, for Defendant–Appellant.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Leon Smallwood was convicted of conspiracy to distribute cocaine base, distribution of cocaine base, and being a felon in possession of a firearm. He was sentenced to life in prison. On appeal, Smallwood challenges his convictions and his sentence. We affirm.

## I. Background

In 1996, Nicole Generally lost all her belongings in an apartment fire and moved to the Dooley Housing Projects in Alton, Illinois. In need of money, Generally turned to Smallwood for help. In March or April of 1996, the two agreed that Smallwood would front Generally crack cocaine for resale. Initially, Smallwood charged Generally $1,325 per ounce of crack. Eventually, however, Smallwood reduced the price to $1,250. In addition to supplying Generally with crack, Smallwood supplied her with advice (such as how much crack to provide for $50), and a scale. The assistance flowed in both directions. For example, Generally allowed Smallwood to sell crack from her apartment, and on one occasion, she held a bag containing three ounces of crack for Smallwood when he feared that he would be discovered by the police.

Smallwood and Generally's arrangement came to an end on September 6, 1996, when the Alton police raided Generally's apartment. During their search of the apartment, the police found 2.6 grams of crack that Smallwood had delivered to Generally on September 4. Generally was charged in state court and taken to the Madison County jail, where she stayed for fourteen months. Smallwood visited her in jail and got her a lawyer. At Smallwood's trial, however, Generally testified for the government, admitting that she hoped that her testimony would win her a lighter sentence.

Generally was not the only person in business with Smallwood. On December 10, 1996, two informants wearing wires made a controlled purchase of crack cocaine from Duane Leady. During the transaction, police heard Leady tell the informants that he needed to get the drugs from Smallwood's house. The police then observed Leady leave his home and enter the home of Smallwood's mother. While Leady was inside, Smallwood arrived. Eventually, Leady emerged and delivered a quarter ounce of crack to the informants.

Leady subsequently agreed to cooperate with the police, and told them that Smallwood sold him the crack that he delivered to the informants.

On January 7, 1997, Leady made a controlled purchase of crack from Smallwood while wearing a wire. When Leady contacted Smallwood, Smallwood told Leady to go to Carl McKinney's apartment at 309 Spring Street. Leady had seen Smallwood at this apartment several times in the past. Therefore he was able to tell police that McKinney's apartment was one of four apartments in the building, and was located on the bottom floor on the left. He also told the police that Smallwood lived in an apartment upstairs in the same building. When Leady went to McKinney's apartment as instructed, Smallwood sold him a quarter ounce of crack. The police observed Smallwood's car outside the building during the transaction. Based on these events, the government filed a sealed complaint against Smallwood on June 23, 1997, and an arrest warrant was issued.

On July 5, 1997, the police observed Smallwood come out the front door of 309 Spring Street and then re-enter the building when he saw them. Acting on the arrest warrant, the police entered the building, knocked on McKinney's door, and announced their presence. Believing that Smallwood might be inside, they entered the unlocked apartment. No one was there, but there was crack cocaine, a scale, and some cash in plain view. While in McKinney's apartment, the police heard movement that suggested that there was someone in the apartment above them. They went upstairs, announced their presence, stated that they had an arrest warrant, and entered Smallwood's apartment through its open door. An open cardboard box containing a semi-automatic handgun with live rounds in the magazine lay on the floor of one of the bedrooms. Police found Smallwood hiding in the closet in another bedroom and placed him under arrest.

On July 7, 1997, a magistrate judge ordered that Smallwood be temporarily detained at the Fayette County Jail. While in jail, Smallwood consulted Clifton Bernard, another inmate and a jailhouse lawyer, about his predicament. Smallwood told Bernard, in the presence of two other detainees named Victoriano Garcia and Don Weidenburner, that the drugs in McKinney's apartment were his and that he was using the apartment as a stash house. However, he stated that he did not think that the police would be able to prove that the drugs were his because he was not in the apartment when the drugs were found. Smallwood also told Bernard that the gun in the upstairs apartment was his, but that the police would not be able to prove it because the apartment was in his sister's name and his clothes were all at his mother's house being laundered. Bernard, who is from California, was in custody on federal drug conspiracy charges. He ultimately pled guilty and agreed to testify truthfully in return for a sentence recommendation from the government.

On September 18, 1997, a grand jury sitting in the Southern District of Illinois returned a six-count superseding indictment charging Smallwood with one count of conspiracy to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, three counts of distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), one count of possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Before trial, Smallwood filed a motion to suppress the physical evidence that had been seized from 309 Spring Street. He claimed that the seizures were illegal because they had not been made pursuant to a search warrant. The district court found that the police lawfully pursued Smallwood into the building in an attempt to execute the arrest warrant, and then lawfully seized the contraband which was in plain view. Accordingly, the court denied Smallwood's motion to suppress the evidence.

Smallwood also asked the district court to suppress the statements that he made to Bernard. He claimed that government agents had instructed Bernard, Garcia, and Weidenburner to engage him in conversation, and had promised them unspecified benefits in exchange. Bernard, Garcia, and Weidenburner testified that they had been given no such instructions, and that they had not attempted to elicit information from Smallwood. The district court found that Smallwood had voluntarily struck up a conversation with the other detainees, and denied the motion to suppress.

With these motions resolved, jury selection began. However, when the venire was brought into the courtroom, Smallwood's attorney moved to discharge it on the grounds that it did not represent a fair cross-section of the community because it contained only one black person. The jury administrator was summoned. She testified that the jurors had been randomly selected using the voter registration list in accordance with the plan of the district court. The district court denied the motion to discharge the venire, and jury selection continued.

When the government peremptorily struck the only black member of the venire, Smallwood's attorney challenged the strike. In response, the government offered the following race-neutral reasons for the strike: (1) the venire member was a teacher, and teachers tend to be sympathetic to defendants; (2) the venire member said that Smallwood looked familiar and might have been a student at the school where the venire member taught; (3) while answering questions, the venire member leaned back and interlocked his hands behind his head, conveying an attitude of superiority; and (4) the venire member stated that he had friends in law enforcement and that they were "just as much into illegal stuff" as the people they

investigated. The district court accepted these explanations and allowed the strike.

Smallwood's attorney was also unhappy that the district court denied his motion to conduct voir dire for longer than the twenty minutes normally allotted, and to question individual jurors. Although the district court orally denied the motion, the court allowed Smallwood's attorney to conduct voir dire for approximately thirty minutes and to ask individual jurors follow-up questions. Smallwood's attorney did not request additional time when the district court informed him that his time was up.

On June 25, 1998, three days after Smallwood's trial began, the district court granted Smallwood's motion for a judgment of acquittal on the possession count, but denied it as to the other counts. The jury returned guilty verdicts on all five remaining counts. On October 2, the district court sentenced Smallwood to life in prison. Smallwood appeals.

## II. DISCUSSION

### A. Motions to Suppress

#### 1. Evidence Seized from 309 Spring Street

■■■ Smallwood contends that the district court should have suppressed the physical evidence seized from 309 Spring Street because it was seized in violation of his Fourth Amendment rights.[1] We will not disturb a district court's denial of a motion to suppress unless the decision was clearly erroneous. *See United States v. Sewell*, 942 F.2d 1209, 1211 (7th Cir.1991). A court's finding is clearly erroneous when "the reviewing court is left with the definite and firm conviction that a mistake has been made." *United States v. Marshall*, 157 F.3d 477, 480–81 (7th Cir.1998), *cert.*

*denied*, —— U.S. ——, 119 S.Ct. 601, 142 L.Ed.2d 542 (1998) (internal quotation marks and citation omitted).

■■■ On appeal, Smallwood does not deny that the police lawfully pursued him into the apartment building at 309 Spring Street in order to arrest him. *See United States v. Santana*, 427 U.S. 38, 43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *United States v. Jones*, 149 F.3d 715, 716 (7th Cir.1998); *Sewell*, 942 F.2d at 1213. Nor does he dispute that once lawfully inside the apartment, the police were entitled to seize any contraband that was in plain view. *See Horton v. California*, 496 U.S. 128, 135, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Instead, he contends that the evidence was not in plain view, and that the testimony of the arresting officer to the contrary was not credible. Such credibility determinations are best left to the district court, which "had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Sewell*, 942 F.2d at 1211. The district court found that the testimony of the police officer was credible, and that the evidence seized was in plain view. This was not clear error.

#### 2. Jailhouse Statements

■■ Smallwood next argues that his jailhouse statements should have been suppressed because they were obtained in violation of his Sixth Amendment right to counsel. More specifically, he contends that "the government intentionally placed [him] in proximity with prisoners who had a strong motive to obtain or fabricate information." (Smallwood Brief, at 16, citing *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).) Again the matter comes down to a credibility determination that we review for clear error. The district court found that

---

**1.** We address only the evidence seized from Smallwood's apartment, since the evidence seized from McKinney's apartment formed the basis of the possession count of which Smallwood was acquitted. In any case, it does not appear that Smallwood personally had an expectation of privacy in McKinney's apartment, or that such an expectation would have been reasonable. *See Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 472, 142 L.Ed.2d 373 (1998).

"Smallwood presented no evidence that 'Government agents' used Garcia, Bernard or Weidenburner to engage Smallwood in conversation or to elicit incriminating information from Smallwood." (Memorandum and Order, Feb. 5, 1998, at 3) The court further found that "the evidence established that Smallwood voluntarily struck up [a] conversation with (and in the presence/hearing of) other prisoners and detainees in the Fayette County Jail." (*Id.*)[2] These findings were not clearly erroneous. Therefore, the district court correctly denied Smallwood's motion to suppress. *See United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir.1982) (finding no Sixth Amendment violation when the defendant failed to establish that the government instructed an inmate to elicit information from him).

### B. Sufficiency of the Evidence

Smallwood argues that there was insufficient evidence to support his convictions. In making his sufficiency challenge, Smallwood "faces a nearly insurmountable hurdle ... [in that] we consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Szarwark*, 168 F.3d 993, 995 (7th Cir.1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir.1997)).

### 1. Conspiracy

■■■■ Count 1 charged Smallwood with conspiring with Generally to distribute crack cocaine between April and September of 1996. In order to establish such a conspiracy, the government was required to prove the existence of "an agreement to commit a crime other than the crime that

consists of the sale itself." *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (*en banc*). Evidence of a buyer-seller relationship is insufficient. *See id.*, at 349 (holding that an agreement "on the one side to sell and on the other to buy" does not constitute a conspiracy even if the buyer intends to resell the drugs so long as the buyer and seller do not have an agreement to further distribute the drugs). Smallwood contends that the government's evidence showed only that Generally purchased drugs from him and then resold them, and thus established no more than a buyer-seller relationship.

■■■■ Smallwood misconstrues the nature of the agreement that must be proven. We have long recognized that "by their very nature, drug conspiracies are loosely-knit ensembles." *United States v. Townsend*, 924 F.2d 1385, 1391 (7th Cir. 1991). An agreement to commit a crime separate from the mere purchase or sale of drugs can consist of an "implicit understanding between the parties regarding the subsequent resale of drugs." *United States v. Hall*, 109 F.3d 1227, 1232 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 153, 139 L.Ed.2d 99 (1997). Such an agreement may be established by circumstantial evidence. *See United States v. Brisk*, 171 F.3d 514, 526 (7th Cir.1999). Thus, "[e]vidence of a conspiracy, as opposed to a buyer-seller relationship, may include transactions involving large quantities of drugs, prolonged cooperation between the parties, standardized dealings, and sales on a credit." *United States v. Berry*, 133 F.3d 1020, 1023 (7th Cir.1998), *cert. denied*, —— U.S. ——, 118 S.Ct. 1851, 140 L.Ed.2d 1100 (1998) (internal citations omitted). If enough such evidence "point[s] in the direction of a concrete, interlocked interest beyond the consummation of the individual buy-sell deals them-

---

2. Similarly, in ruling on Smallwood's motion for a new trial, the district court held that the "evidence at trial (like the evidence at the suppression hearing) showed that Smallwood voluntarily made these statements at the Fay-

ette County Jail," and that Smallwood was "not coerced, he was not tricked, [and] no Government agent was used to elicit information from him." (Memorandum and Order, Aug. 6, 1998, at 9.)

selves, we will not disturb the conclusion reached by the finder of fact that at some point the association blossomed into a cooperative venture." *United States v. Clay*, 37 F.3d 338, 342 (7th Cir.1994).

In this case, the evidence of an interlocked interest was ample. Smallwood frequently supplied crack cocaine to Generally at a set price over a period of five months. The crack was given to Generally on credit. As the relationship strengthened, Smallwood began to supply the crack at a discount. Smallwood gave Generally advice about selling crack, and gave her a scale to facilitate her sales. Generally allowed Smallwood to sell cocaine from her apartment, and occasionally helped Smallwood hide his activities from the police. When Generally was put in jail, Smallwood got her a lawyer. Based on this evidence, a rational jury could have concluded beyond a reasonable doubt that Smallwood and Generally conspired to distribute cocaine. *See Lechuga*, 994 F.2d at 350 ("If, knowing that Lechuga was a drug dealer, Pagan assisted him in distributing drugs ... then Lechuga and Pagan were coconspirators.").

### 2. Felon in Possession of a Firearm

As to count 6, which charged Smallwood with being a felon in possession of a firearm, Smallwood claims that the government failed to prove beyond a reasonable doubt that he possessed the firearm found in the upstairs apartment at 309 Spring Street. Possession may be either actual or constructive. In this case, the government alleged constructive possession. Therefore, the only issue before us is whether the government proved beyond a reasonable doubt that Smallwood knowingly had the power and the intention to exercise dominion and control over the firearm. *See United States v. Lloyd*, 71 F.3d 1256, 1266 (7th Cir.1995). A defendant need not own a firearm in order to possess it. *See United States v. Hubbard*, 61 F.3d 1261, 1272 (7th Cir.1995). Constructive possession may be proven either by direct or circumstantial evidence. *Id.* at 1267.

Smallwood insists that neither the physical evidence nor Bernard's testimony was sufficient to support his conviction. However, we need not decide whether either type of evidence was sufficient standing alone because, taken as a whole, the evidence clearly provided a sufficient basis for the jury's verdict. The crux of Smallwood's argument is that Bernard's testimony should not have been credited by the jury because Smallwood's admissions to Bernard were not adequately corroborated. It is true that "a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Wong Sun v. United States*, 371 U.S. 471, 488–89, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See also United States v. Grizales*, 859 F.2d 442, 445 (7th Cir.1988) (The requirement that a defendant's statements be corroborated "extends beyond strict confessions to cover statements by the accused that show essential elements of the crime."). However, corroborative evidence need not independently establish each element of the crime. *See United States v. Jackson*, 103 F.3d 561, 567 (7th Cir.1996); *United States v. Bukowski*, 435 F.2d 1094, 1106 (7th Cir. 1970). It need only "ensure the reliability of the confession or admission of the accused." *Bukowski*, 435 F.2d at 1106. *See also United States v. Howard*, 179 F.3d 539, 541 (7th Cir.1999). Therefore, "one available mode of corroboration is for the independent evidence to bolster the confession itself." *Bukowski*, 435 F.2d at 1107 (quoting *Smith v. United States*, 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192 (1954)); *Howard*, 179 F.3d at 541. In this case, Smallwood's admissions were adequately corroborated by the fact that the police found the firearm in plain view in the apartment where Smallwood was hiding and where Leady said that Smallwood lived.

As even Smallwood concedes, Bernard's testimony, if credited, sufficed to allow the jury to find guilt beyond a reasonable doubt. Such credibility determinations belong to the jury, *see United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir.1996) ("Questions of witness credibility are reserved for the jury, and its assessments will not be second-guessed by an appellate panel."); and Smallwood's jury obviously believed Bernard's testimony. This testimony, bolstered by the evidence found at 309 Spring Street, was sufficient to support Smallwood's conviction of count 6.

### 3. Other Charges

As to the sufficiency of the evidence with respect to the three distribution charges, Smallwood's brief states simply: "Counts Two, Three, and Four should also have been dismissed." (Smallwood Brief, at 7). We decline to address this claim because "[u]ndeveloped and unsupported claims are waived." *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.1993).

## C. Challenges to the Jury

### 1. Fair Cross Section of the Community

Smallwood next argues that the district court deprived him of his right to a jury selected from a fair cross section of the community. In order to establish a prima facie violation of this right, Smallwood was required to show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires . . . is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of this group in the jury-selection process." *Johnson v. McCaughtry*, 92 F.3d 585, 590 (7th Cir. 1996) (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). The district court held that Smallwood had failed to establish the second and third elements of a prima facie case. We review this factual determination for clear error.

The jury administrator testified that 137 qualified jurors had been selected electronically to serve in the East St. Louis Division of the Southern District of Illinois for the month of June, 1998. Of the 137 qualified jurors, 24 were black. On June 22, 1998, the day that the Smallwood jury was empaneled, 62 of the 137 jurors actually appeared. Two black jurors were excused, and two did not appear for jury duty. Of the 62 jurors who reported on June 22, three or four were black. Thirty-five of the 62 jurors who reported were randomly assigned to the venire for Judge Riley's courtroom. Only one member of the venire was black. The jury administrator testified that the jurors had been randomly selected using the voter registration list in accordance with the plan of the district court.

Based on these numbers, Smallwood contends that his jury was not selected from a fair cross section of the community. More particularly, he complains that: (1) only 5% of the people who reported for jury duty on June 22 were black, while 25% of the community is black (he does not indicate the basis for this 25% figure), and (2) of the jurors assigned to Judge Riley's courtroom, only one was black.

Even if we assume that Smallwood has demonstrated that black people were under-represented in the jury selection process, his claim fails because he has not established that the under-representation was a result of systematic exclusion; i.e., exclusion that is inherent in the process used to select the jury. *See United States v. Cooke*, 110 F.3d 1288, 1301 (7th Cir. 1997). We have often approved the random selection of venires from voter registration lists. *See, e.g., United States v. Ashley*, 54 F.3d 311, 314 (7th Cir.1995); *United States v. Guy*, 924 F.2d 702, 707 (7th Cir.1991). Smallwood has offered no evidence that this procedure was not fol-

lowed. In fact, Smallwood has given us no reason to think that the alleged under-representation resulted from anything other than coincidence. *See Guy*, 924 F.2d at 706. *Cf. Duren*, 439 U.S. at 366, 99 S.Ct. 664 (defendant demonstrated that "a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year"). Accordingly, the district court did not clearly err when it denied Smallwood's motion to dismiss the venire. Since we hold that Smallwood failed to demonstrate systematic exclusion, we need not consider whether he established under-representation.

### 2. *Batson* Challenge

■■■ Smallwood next argues that the government's peremptory strike of the only black member of the venire violated *Batson v. Kentucky*'s prohibition of race-based peremptory strikes. *See Batson*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under *Batson*, a court must follow a three-step method when evaluating a challenge to a peremptory strike:

> First, the party alleging a violation must make a prima facie showing of intentional discrimination. Second, once this showing has been made, the burden shifts to the party that exercised the challenge to articulate a [race]-neutral explanation for the challenge. Finally, the trial judge must decide whether the reasons offered are pretextual and whether the party alleging a violation has met its burden of proving purposeful discrimination.

*Brisk*, 171 F.3d at 522 (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712). In this case, the district court held that even if it assumed that Smallwood had made a prima facie showing of discrimination, his *Batson* challenge failed because the government had provided race-neutral reasons for the strike that were not pretextual. We review the district court's finding for clear error. *See United States v. Roberts*, 163 F.3d 998, 999 (7th Cir.1998).

■■ "[U]nlike a challenge for cause, a peremptory strike need not be based on a strong or good reason, only founded on a reason other than race." *United States v. Brown*, 34 F.3d 569, 571 (7th Cir.1994). The government stated that it struck the black venire member because the venire member was a teacher, the venire member thought that Smallwood looked familiar, the venire member's body language suggested an attitude of superiority, and the venire member may have been biased against law enforcement. The district court was in the best position to evaluate whether these reasons were pretextual. *See Roberts*, 163 F.3d at 1000 ("[D]istrict judges are much better situated than appellate judges to evaluate the honesty of the lawyers who practice in district court."). It found that they were not. This was not clear error.

### 3. Limitation of Voir Dire

■■ Smallwood next objects to the district court's denial of his motion for extra time to conduct voir dire. Although he was allowed to question the jury for thirty minutes (ten minutes longer than the usual allotment), he complains that the period of time he was given was "wholly insufficient to probe the panel so as to effectively and intelligently exercise [his] peremptory strikes." (Smallwood Brief, at 19.) He further asserts that as a result of the district court's limitation of voir dire, he was unable "to determine whether the all-white jury harbored biased racial attitudes." (*Id.*) This argument is unpersuasive.

Smallwood did not ask any questions about race during his thirty minutes of questioning. He does not indicate what he would have asked if he had been given additional time. Most importantly, he does not explain his failure to object or ask for additional time when the district court indicated that his time was up. In short, he has provided no basis for us to conclude that the district court improperly limited his voir dire. *See United States v. Rick-*

*etts*, 146 F.3d 492, 495–96 (7th Cir.1998) (holding that defendants' argument that the district court improperly limited voir dire was meritless when the defense wasted time during voir dire and failed to request additional time when its time had expired).[3]

### D. Life Sentence

 Smallwood argues that, although his life sentence "technically conform[s] to the law," it is unjust and should be vacated because there was insufficient evidence to support his convictions, his case was tried before an all-white jury, and his criminal history was relatively modest. (Smallwood Brief, at 20.) In support of this argument, Smallwood cites *Koon v. United States* for the proposition that a district court may depart downward if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (citing 18 U.S.C. § 3553(b)). However, this principle does not apply to Smallwood's sentence, which was mandated by 21 U.S.C. § 841(b)(1)(A), because 18 U.S.C. § 3553(b) only authorizes departures from sentences imposed under the Sentencing Guidelines. It does not authorize departures from statutory mandatory minimum sentences. *See United States v. Arrington*, 73 F.3d 144, 147 (7th Cir.1996) (A defendant can receive a sentence below the statutory minimum only if the government makes a motion for a departure based on the defendant's substantial assistance, 18 U.S.C. § 3553(e), or if the defendant qualifies for sentencing under the safety valve provision, 18 U.S.C. § 3553(f).); *United States v. Verners*, 103 F.3d 108, 111 (10th Cir.1996) ("[T]he district court has no discretion to depart from a statutory minimum sentence for section 3553(b) mitigating circumstances."). Smallwood does not

---

3. In fact, the district court was not required to allow Smallwood to voir dire the jury at all. The court could have opted to conduct

attack his sentence on any other grounds. Therefore, he has failed to show that his sentence was erroneous.

### CONCLUSION

For the foregoing reasons, Smallwood's convictions and sentence are AFFIRMED.

---

the entire voir dire itself. *See* Fed.R.Crim.P. 24(a).