**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David J. FARROW, Defendant–Appellant.**

No. 98–4057.

United States Court of Appeals, Sixth Circuit.

Argued: Aug. 6, 1999

Decided and Filed: Dec. 8, 1999

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 15, 2000.

---

Edward G. Bryan (argued and briefed), FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant.

Phillip J. Tripi (argued and briefed), OFFICE OF THE U.S. ATTORNEY, Cleveland, Ohio, for Appellee.

Before: NELSON and MOORE Circuit Judges; ROSEN, District Judge.*

ROSEN, D.J., delivered the opinion of the Court, in which NELSON, J., concurred except as to Part IV.B and MOORE, J., concurred except as to Part IV.C. NELSON (pp. 200–02), and MOORE

---

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

(pp. 202–05), JJ., delivered separate opinions concurring in part and dissenting in part.

## OPINION

ROSEN, District Judge.

### I. *INTRODUCTION*

Defendant/Appellant David J. Farrow appeals from his conviction and thirty-six (36) month sentence for assault on a federal officer in violation of 18 U.S.C. § 111(a)(1). Farrow raises four arguments on appeal: (1) that the evidence at trial was insufficient to sustain a conviction; (2) that the trial court engaged in impermissible double counting by imposing a four-level enhancement under United States Sentencing Guideline ("U.S.S.G") § 2A2.2(b)(2) for otherwise using a dangerous weapon; (3) that the trial court erred by imposing a three-level enhancement under U.S.S.G. § 3A1.2(a) for the official status of the victim; and (4) that the District Court abused its discretion by failing to grant a downward departure based on Farrow's alien status. For the reasons stated below, we affirm the District Court's determinations on three of these four issues, but conclude that the application of U.S.S.G. § 2A2.2(b)(2) does, in this case, constitute impermissible double counting.

### II. *FACTUAL BACKGROUND*

Defendant/Appellant David J. Farrow entered the United States from Great Britain on March 27, 1994 for an authorized visit of up to 90 days pursuant to the Visa Waiver Pilot Program.[2] During this visit, Farrow intended to marry his fiancé, Gail Walker, an American citizen from Ohio who Farrow had met on a 1993 trip to the United States to visit his aunt. Walker and Farrow were wed on May 28, 1994 in Farmington, Ohio, but the relationship quickly deteriorated and the couple

separated four months later. During their separation, the couple had a child, Tiffany Walker, who was born on February 8, 1995 and lives with her mother.

Shortly before Farrow's 90–day visitation period was set to expire, he and Walker obtained paperwork from the Immigration and Naturalization Service ("INS") that would have permitted him to remain in the country as the spouse of an American citizen. Following the couple's separation, however, Walker elected not to file this paperwork. Instead, she notified the INS in March of 1997 that Farrow had remained in the United States beyond his period of authorization.

Several months passed before the INS pursued this lead. Eventually, on February 5, 1998, INS Agent Timothy Ward embarked upon an effort to locate Farrow. Agent Ward first spoke with Darren LaForce, the manager of an apartment complex in Burton, Ohio, where Farrow had stayed from time to time. When Agent Ward inquired about Farrow's whereabouts, LaForce asked in turn about the nature of Agent Ward's inquiry. Although Agent Ward advised LaForce that he was pursuing an INS investigation, and although he "quick[ly]" flashed a badge, LaForce declined to provide any information, citing the variety of inquiries he receives about apartment residents and his uncertainties about Agent Ward's identity and the purpose of his visit. (J.A. at 174–76.)

Agent Ward next proceeded to West Farmington, Ohio, where he spoke with Farrow's friend, Don Malone. Agent Ward gave his name, stated that he was with a "law enforcement agency," and advised Malone that he needed to "serve some paperwork on" Farrow. (J.A. at 139.) Like LaForce, Malone failed to provide any information on Farrow's whereabouts. As Agent Ward left, he noticed a vehicle parked nearby and copied down its

---

**2.** The Visa Waiver Pilot Program permits aliens from certain countries, including Great Britain, to enter the United States without a visa for up to 90 days, provided that they waive their right to contest any action seeking their deportation. *See* 8 U.S.C. § 1187.

license plate number. He later learned that this car was registered to Farrow.

Finally, Agent Ward telephoned Farrow's estranged wife, Gail Walker. Walker informed Agent Ward that Farrow was scheduled to visit her apartment in Warren, Ohio, that very night at 10:00 p.m. Agent Ward also learned that Walker had arranged for a process server to serve divorce papers on Farrow during his scheduled visit.

In the meantime, Farrow learned that afternoon about Agent Ward's efforts to locate him. In a written statement given to the INS on February 7, 1998, Farrow stated that he had learned on February 5 that an immigration agent named Tim Ward was looking for him, and that Don Malone also had advised him that day that a law enforcement officer was looking for him. (J.A. at 238.) In addition, Darren LaForce testified at trial that Farrow had visited him at around 2:30 p.m. that afternoon, and that Farrow already was aware that the INS was looking for him regarding "some paperwork he needed to sign." (J.A. at 176–77.)

Later in the day, Farrow visited a friend, Stanley Allison, and informed Allison that he was going to meet his wife at her apartment later that evening. Allison testified at trial that he advised Farrow to "watch his self and that it might be some kind of a set up," because "when people are not getting along, or like getting a divorce or something, you know, people do strange things." (J.A. at 144.)[3]

That evening, Agent Ward and INS Special Agent Mark Baskfield arrived at Walker's apartment at approximately 9:00 p.m., dressed in plain clothes. Process server Thomas Cool and a friend, Gordon Pflager, also had just arrived at the apartment, and all four men learned from Walker's mother that Walker was not home, that Farrow had already stopped by the apartment at approximately 7:00 p.m., and that he planned to return at around 10:00 p.m. Armed with this information, the INS agents invited the two other men to wait for Farrow in the agents' unmarked car,[4] which was parked in the apartment parking lot with a view of the entire complex. The INS agents asked Cool and Pflager to wait for the agents to complete their interview with Farrow before serving him with the divorce papers.

At approximately 9:50 p.m., Farrow arrived at the apartment complex, driving a car that matched the description obtained by the INS agents. It was dark at that hour, but the parking lot was illuminated. Farrow drove past the government vehicle, continued through the parking lot, and backed into a space at the end of the lot, parking next to a van on the passenger side of his vehicle. Without activating the police lights, Agent Ward followed Farrow to the end of the lot and stopped in front of the van, at a location where Farrow's view of the INS vehicle was obscured by the van. All four men then exited the INS vehicle and approached Farrow's car from around the van. Agents Ward and Baskfield did not identify themselves as INS

3. In his February 7, 1998 statement to the INS, Farrow also recounted an incident that had occurred about a month earlier, when he had been threatened by his wife and a neighbor that "they would get some people to get me" in response to Farrow's act of touching a neighborhood girl on the back of her head while playing with his niece and nephews. (J.A. at 238.) Moreover, upon being asked by defense counsel at trial to characterize the extent of criminal activity at the Lancer Court apartment complex where Gail Walker lived, Captain Timothy Roberts of the Warren, Ohio, police department testified that "[o]n a scale of one to five, with five being the worst, I would classify Lancer Court as being a four," and that he "would be wary" if he visited Lancer Court after dark. (J.A. at 180.)

4. The INS agents' vehicle was a blue Chevrolet Caprice equipped with a "police package," which consisted of a cage separating the front and back seats and blue police lights in the front grill and at the rear of the passenger compartment, adjacent to the rear window. Agent Baskfield acknowledged at trial that this car was not readily identifiable as a police vehicle. (J.A. at 160.)

officers, show their badges, or display any weapons.

As Agent Ward walked in front of Farrow's car toward the driver's side, Farrow shifted his car into gear, pulled forward, and struck Ward on the left knee.[5] Agent Ward deflected the impact by jumping onto the hood of the car, and he and Agent Baskfield began to yell "police," "stop," and "federal agents." While Agent Ward remained on the hood of the car, Farrow continued to pull his vehicle out of its parking space, turned right, and sideswiped the right front bumper of the INS vehicle. As Farrow traveled a few car lengths past the INS vehicle, Agent Ward drew his gun, put it to the windshield, and yelled, "Stop. Police." Farrow stopped the car and Agent Baskfield, who had pursued on foot, removed Farrow from the car and placed him under arrest. As Agent Baskfield removed Farrow from the car, Farrow began to apologize. Agent Ward suffered minor injuries to his left knee from the incident.

Two days later, Agents Ward and Baskfield interviewed Farrow and obtained a written statement from him. In this statement, Farrow cited the prior threat from his wife and her neighbor as the reason why he "panicked" when he saw men approaching his car on the night of February 5, 1998. (J.A. at 238–39.) In an oral statement to Agent Baskfield, Farrow claimed that he was not concerned that an INS agent was looking for him, and that he was unsure whether he could stay in the United States, in light of his marriage and his daughter born in the country. (J.A. at 158.)

## III. *PROCEDURAL BACKGROUND*

### A. The Charge and Trial

On March 11, 1998, Farrow was charged in a one-count indictment with knowingly and forcibly assaulting a federal officer, in violation of 18 U.S.C. § 111(a)(1) and punishable under 18 U.S.C. § 111(b).[6] Specifically, the indictment alleged that Farrow used a motor vehicle to assault Agent Ward while the INS agent was engaged in the performance of his official duties.

Trial commenced on May 19, 1998 before U.S. District Judge Sam H. Bell. The jury returned a verdict of guilty on May 22, 1999. By Order issued July 16, 1998, the District Court denied Farrow's motion for judgment of acquittal or new trial.

### B. The Sentencing

Following Farrow's conviction, the United States Probation Department prepared a Presentence Investigation Report stating that Farrow was subject to the enhanced penalty of 18 U.S.C. § 111(b), and assigning a base offense level of 15 under the sentencing guideline for aggravated assault, U.S.S.G. § 2A2.2.[7] The sentencing report then applied three enhancements to

---

5. Agent Ward testified that Farrow "made eye contact" with him before putting his car into gear and pulling forward. (J.A. at 112.)

6. 18 U.S.C. § 111 provides, in relevant part:

 **(a) In general.** Whoever—
 (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . .

 \* \* \*

 shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than three years, or both.
 **(b) Enhanced penalty.** Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than ten years, or both.

7. As discussed in detail below, a conviction under § 111(a)(1) without the § 111(b) enhancement typically would fall within U.S.S.G. § 2A2.4 rather than § 2A2.2, and would carry a base offense level of 6 rather than 15.

this base offense level: (1) a four-level enhancement under U.S.S.G. § 2A2.2(b)(2)(B) for "otherwise us[ing]" a dangerous weapon; (2) a two-level enhancement under U.S.S.G. § 2A2.2(b)(3)(A) for bodily injury to the victim; and (3) a three-level enhancement under U.S.S.G. § 3A1.2(b) for the official status of the victim. Thus, the report recommended a final offense level of 24. Farrow filed objections to all three enhancements, and also moved for downward departure on several grounds.

At the August 27, 1998 sentencing hearing, Farrow testified extensively about the events leading up to the February 5, 1998 incident. Following this testimony, the District Court sustained Farrow's objection to the two-level enhancement for bodily injury, finding that "any injury" to Agent Ward was "minimal." (J.A. at 221–22.) The Court also granted a two-level downward departure, determining that Farrow's offense constituted a single act of aberrant behavior. However, the Court rejected Farrow's objections to the "otherwise used" and "official victim" enhancements. In the end, the District Court sentenced Farrow to 36 months of imprisonment, based on an offense level of 20 and a Category I criminal history.

## IV. ANALYSIS

### A. Sufficiency of the Evidence

■ As his initial argument on appeal, Farrow asserts that the Government presented insufficient evidence to sustain his conviction under 18 U.S.C. § 111(a)(1), and that the trial court therefore erred in denying his motion for judgment of acquittal. In reviewing a challenge to the sufficiency of the evidence, we must not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir.1999). "Instead, we determine merely whether, after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all

inferences that could reasonably be drawn from the testimony, a rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Id.*

■ As noted above, the Government charged Farrow with knowingly and forcibly assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1). In order to obtain a conviction under this statute, the Government need not show that the assailant was aware of the victim's official status. *United States v. Feola*, 420 U.S. 671, 684, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975); *United States v. Boone*, 738 F.2d 763, 765 (6th Cir.), *cert. denied*, 469 U.S. 1042, 105 S.Ct. 528, 83 L.Ed.2d 416 (1984). However, the Government must prove that the federal officer was engaged in official duties at the time of the assault. *Boone*, 738 F.2d at 765.

In addition to this "federal officer" element, § 111(a)(1) requires proof that the defendant acted knowingly and that he committed a forcible assault. *See United States v. Plummer*, 789 F.2d 435, 437–38 (6th Cir.1986). At the close of trial, the District Court defined these terms as follows:

> With respect to the term forc[i]ble assault, you are instructed that the term includes any willful attempt or threat to inflict physical injury or reasonable fear of such injury upon another with force or strength, together with the present ability to do so.

> With respect to the term knowingly, I instruct you that an act is knowingly done if it is done voluntarily and purposefully, and not because of mistake or accident or some other innocent reason.

> The purpose of adding the word knowingly is to insure that no one will be convicted because of mistake or accident or other innocent reason.

(J.A. at 199.)

■ Farrow does not challenge these instructions, nor the determination that Agent Ward was engaged in his official

duties as a federal officer on the night of February 5, 1998. Farrow argues, however, that the evidence was insufficient for a rational juror to conclude beyond a reasonable doubt that he intended to harm Agent Ward. Instead, he views the evidence as showing that he simply panicked and acted out of fear when strangers approached his vehicle in the parking lot of his wife's apartment complex.[8]

■ Viewing the evidence in the light most favorable to the prosecution, we cannot accept Farrow's challenge to the sufficiency of this evidence. The Government introduced ample evidence from which the jury could infer that Farrow purposefully placed his car into gear and drove at Agent Ward. In particular, Agent Ward testified at trial that when he walked in front of Farrow's vehicle, Farrow "looked at me and made eye contact" before placing his car into gear, driving toward the INS agent, and striking Agent Ward's knee. (J.A. at 112.) Agent Ward further testified that after he was struck on the knee and jumped on the hood of Farrow's car, Farrow accelerated, collided with the INS vehicle, and continued to drive through the parking lot, despite the shouts of "stop" and "police" by Agents Ward and Baskfield. (J.A. at 116–17.) According to Agent Ward, Farrow continued to accelerate his vehicle until the INS agent was able to draw his weapon and place it on the windshield directly in front of Farrow. (J.A. at 118–19.)

In addition to this testimony, the Government introduced Farrow's written statement executed two days after the incident, in which he acknowledged seeing Agent Ward in front of the car and then driving forward:

> I pulled up, never see anybody around when I pulled in, and all of [a] sudden there were people there, I panicked and tried to get away, Mr. Ward was in front of me and ended up on my hood, I caught the front of his car when I went past, then I decided to stop, I saw Mr. Ward's gun . . . .

(J.A. at 239.) This statement, when combined with the testimony of Agent Ward, provides a sufficient basis for a reasonable juror to conclude that Farrow saw a person in front of his car and made a conscious decision to drive forward, striking that individual. This view of the evidence, if adopted by the jury, is sufficient to support a conviction under 18 U.S.C. § 111(a)(1).

To be sure, Farrow introduced evidence in support of his claim that he acted for an "innocent reason"—namely, out of fear for his safety when strangers approached his car at night. In his statement to the INS, Farrow cited a prior dispute with his estranged wife and her neighbor as the basis for his wariness as he visited his wife's apartment complex on the night in question, and he stated that "I panicked" when he saw men approaching his vehicle in the

8. Although Farrow repeatedly speaks of his purported lack of "intent to harm" Agent Ward, it is not at all clear that such intent must be shown here. While this Court has not yet addressed the question, other courts have concluded that § 111(a)(1) sets forth a "general intent" rather than a "specific intent" crime. *See, e.g., United States v. Ricketts,* 146 F.3d 492, 497 (7th Cir.1998); *United States v. Kleinbart,* 27 F.3d 586, 592 (D.C.Cir.), *cert. denied,* 513 U.S. 978, 115 S.Ct. 456, 130 L.Ed.2d 365 (1994); *United States v. Sanchez,* 914 F.2d 1355, 1358 (9th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991). To establish general intent, the Government need not show that the defendant intended to injure a federal officer, but only "the knowing commission of an act that the law makes a crime." *Kleinbart,* 27 F.3d at 592 n. 4.

We need not resolve this issue here. Farrow's challenge to the sufficiency of the evidence does not turn on any distinction between specific intent—*i.e.,* intent to injure—and general intent—*i.e.,* intent to drive a car toward a federal officer. Although Farrow speaks of "intent," the thrust of his argument is that he did not act "knowingly," as the District Court defined that term, because he mistakenly believed that the men approaching his car meant to do him harm. This claim, if accepted by the jury, would provide an innocent reason for his actions and would warrant acquittal, regardless of his intent in so acting.

dark. (J.A. at 238.) Moreover, Farrow's friend, Stanley Allison, testified that on the afternoon of February 5, "I told [Farrow] to be careful, watch his back" when visiting his wife later that night, because "it might be some kind of a set up." (J.A. at 144.) The Government in turn points to evidence tending to rebut this claim of "innocent reason," including Farrow's statement that he was informed on February 5 that an INS agent named Tim Ward "was looking for me," (J.A. at 238), and the testimony of Darren LaForce that Farrow was aware that the INS was looking for him when he visited LaForce on the afternoon of February 5. (J.A. at 177.)

In weighing this evidence, the jury could have concluded that Farrow acted out of fear for his safety, but it was by no means compelled to so conclude. Rather, there was sufficient evidence on either side of the question to permit a reasonable juror to reject Farrow's innocent explanation for his actions on the night of February 5, 1998. Accordingly, we decline to substitute our judgment for that of the jury, and hold that sufficient evidence was introduced at trial to sustain Farrow's conviction.

## B. Double Counting in Farrow's Sentencing

As his second assignment of error, Farrow contends that the trial court impermissibly "double counted" in sentencing by relying upon the same conduct—Farrow's use of his car as a dangerous weapon—as the basis for both an elevated base offense level of 15 for aggravated assault and a four-level "otherwise used" enhancement under U.S.S.G. § 2A2.2(b)(2)(B). In response, the Government argues that U.S.S.G. § 1B1.1 permits double counting unless a guideline expressly instructs otherwise, and that U.S.S.G. § 2A2.2 nowhere prohibits double counting. As this issue involves only the District Court's legal conclusions in applying the aggravated assault guideline and the "otherwise used" enhancement,

we review de novo the lower court's resolution of this sentencing matter. See United States v. Perkins, 89 F.3d 303, 307 (6th Cir.1996).

In analyzing Farrow's double counting argument, the starting point of the inquiry is Appendix A to the Sentencing Guidelines, which specifies the guideline section or sections applicable to the statute of conviction. Pursuant to Appendix A, an individual convicted under 18 U.S.C. § 111 may be sentenced under either U.S.S.G. § 2A2.2 or § 2A2.4. Section 2A2.2 governs aggravated assaults and sets a base offense level of 15, while § 2A2.4 pertains to obstructing or impeding officers and imposes a base offense level of 6. In determining the appropriate guideline to apply, Appendix A instructs that the sentencing court should "use the guideline most appropriate for the nature of the offense conduct charged in the count of which the defendant was convicted."

In the present case, Farrow does not contest the District Court's finding that Farrow used his car as a dangerous weapon in the course of the assault, nor the lower court's conclusion that Farrow's offense was properly classified as an aggravated assault subject to a base offense level of 15 under U.S.S.G. § 2A2.2. We likewise find no error in this determination. The application notes to § 2A2.2 define an "aggravated assault" as "a felonious assault that involved (A) a dangerous weapon with intent to do bodily harm (i.e., not merely to frighten), or (B) serious bodily injury, or (C) an intent to commit another felony." U.S.S.G. § 2A2.2, Application Note 1. Although subparts (B) and (C) of this definition do not apply here, Farrow's conduct falls within subsection (A) as involving a "dangerous weapon," his car. See United States v. Beckner, 983 F.2d 1380, 1383 n. 1 (6th Cir.1993) (recognizing that a car can be a dangerous weapon under the Sentencing Guidelines). Thus, the District Court appropriately

chose to apply § 2A2.2 rather than § 2A2.4.[9]

However, Farrow takes issue with the next step in the District Court's sentencing decision: namely, that Farrow's use of his car as a dangerous weapon in his assault on Agent Ward subjects him to a four-level enhancement under U.S.S.G. § 2A2.2(b)(2)(B) for "otherwise us[ing]" a dangerous weapon.[10] Farrow contends that his use of an automobile as a dangerous weapon may not provide the basis *both* for determining that he committed an aggravated assault *and* for applying a four-level "otherwise used" enhancement to his sentence for aggravated assault. According to Farrow, this use of the same conduct for two different sentencing purposes amounts to impermissible "double counting."

As Farrow points out, the Second Circuit Court of Appeals reached precisely this conclusion under factually similar circumstances. In *United States v. Hudson*, 972 F.2d 504 (2d Cir.1992), the defendant, Albert Hudson, drove his car at two U.S. Marshals who were attempting to arrest him on two outstanding warrants. Following a guilty plea, the sentencing judge adopted the recommendations set forth in the Presentence Report, which assigned a base offense level of 15 under U.S.S.G. § 2A2.2(a) for aggravated assault and applied a four-level enhancement under § 2A2.2(b)(2) for "otherwise us[ing]" a dangerous weapon, Hudson's car. Hudson

argued that this sentence impermissibly "double counted" the same conduct—his use of a car—first to make his offense an aggravated assault, and then to increase his offense level from 15 to 19.

The Second Circuit agreed, and vacated Hudson's sentence. In so ruling, the Court observed that the "graduated adjustment scheme" set forth at § 2A2.2(b)(2) appeared to contemplate the assailant's possession or use of an "inherently dangerous" weapon, such as a firearm:

As Hudson suggests, where the dangerous weapon is a firearm there is a clear increase in wrongfulness of conduct which corresponds to the Guidelines' graduated adjustment scheme, such that: (1) if the gun is merely possessed, the defendant receives only the base offense level; (2) if the use of the gun is threatened, there is a three-level increase; (3) if the gun is "otherwise used", a defendant would receive a four-level increase; and (4) if the gun is fired a defendant would receive a five-level increase. See U.S.S.G. § 2A2.2(b). In the present case, by contrast, an automobile is not an inherently dangerous weapon, and only became dangerous once it was "otherwise used" in an assault or its use was threatened. Therefore, unlike the situation where the weapon is a gun or other inherently dangerous weapon, aggravated assault

**9.** Although Farrow does not challenge this determination, he characterizes the use of a dangerous weapon as the "conduct that elevated the offense from minor assault to aggravated assault." (Appellant's Br. at 29.) We cannot agree that any "elevation" was involved in the District Court's decision to apply § 2A2.2, the guideline for aggravated assault, rather than the minor assault guideline at § 2A2.3. Minor assault and aggravated assault are two distinct offenses under the Sentencing Guidelines, and the form of assault of which Farrow was convicted under 18 U.S.C. § 111(a)(1) and § 111(b) simply does not constitute "minor assault" as that offense is defined under § 2A2.3. Thus, Farrow's offense *was* not "elevated" to aggravated assault; it was an aggravated assault. Although, as dis-

cussed below, we share Farrow's concern about "double counting" in his sentence, we wish to emphasize that we do not view Farrow's sentence as the product of two "enhancements" based on the same conduct.

**10.** The sentencing guideline for aggravated assault imposes various enhancements relating to dangerous weapons:

(A) If a firearm was discharged, increase by 5 levels; (B) if a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels; (C) if a dangerous weapon (including a firearm) was brandished or its use was threatened, increase by 3 levels. U.S.S.G. § 2A2.2(b)(2).

with a car will always lead to a three or four-level enhancement, because mere possession of a car during an assault will not convert an ordinary assault into an aggravated one.

\* \* \*

A defendant can not be guilty of assault with a non-inherently dangerous weapon (such as a chair or an automobile) unless the object is used (or its use is threatened) in a dangerous way. In such instances, it is the use or threatened use of the object which makes the assault aggravated, thereby increasing the base level of the offense, and this same act also requires an upward adjustment of three or four levels under U.S.S.G. § 2A2.2.

972 F.2d at 506–07. Based on this concern that the use of an ordinary object as a dangerous weapon invariably leads to a "two-fold upward adjustment"—*i.e.*, application of the aggravated assault guideline *and* imposition of the four-level "otherwise used" enhancement—the Court concluded that the "incremental adjustment schedule" at § 2A2.2(b)(2) should be applied only in cases "involving inherently dangerous weapons." 972 F.2d at 507.

*Hudson* noted that the Fourth Circuit Court of Appeals had previously reached the opposite result in *United States v. Williams*, 954 F.2d 204 (4th Cir.1992). The *Williams* Court, like the Second Circuit in *Hudson*, recognized that § 2A2.2(b)(2) establishes a "graduated adjustment scheme" that increases the offense level in proportion to the degree of involvement of the dangerous weapon. 954 F.2d at 206–07. *Williams*, however, concluded that the trial court's refusal to

apply the "otherwise used" enhancement in that case, where the defendant had assaulted a fellow inmate with a metal chair, would "effectively eviscerate" the incremental schedule at § 2A2.2(b)(2) by failing to account for the defendant's actual use of a dangerous weapon, rather than mere possession or threatened use. 954 F.2d at 207. The Court further noted its prior ruling in *United States v. Curtis*, 934 F.2d 553 (4th Cir.1991), that double counting is permitted unless expressly prohibited by the Sentencing Guidelines, and observed that § 2A2.2 includes no such prohibition. 954 F.2d at 207–08.[11]

This Circuit has not yet addressed the double counting concern raised by § 2A2.2 in cases involving ordinary objects used as dangerous weapons. Nevertheless, the Government suggests that the result of our inquiry here is foreordained, and that we are precluded from following *Hudson*, by virtue of a post-*Hudson* amendment to the Sentencing Guidelines, taken together with certain of our precedents. The Government begins this argument by citing a 1993 amendment to U.S.S.G. § 1B1.1, Application Note 4, which added language providing that "[a]bsent an instruction to the contrary, the adjustments from different guideline sections are applied cumulatively (added together)."

The Government then points to our decision in *United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir.1996), in which we held that this 1993 amendment to U.S.S.G. § 1B1.1 effectively overruled two of our earlier decisions prohibiting a particular type of double counting.[12] According to the Government, *Cobleigh* adopts a presumption in favor of double counting, simi-

---

**11.** In declining to follow *Williams*, the *Hudson* Court noted that Second Circuit law does not share this presumption that double counting is permitted. *Hudson*, 972 F.2d at 507.

**12.** Specifically, in *United States v. Chichy*, 1 F.3d 1501, 1505–07 (6th Cir.), *cert. denied*, 510 U.S. 1019, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993), and *United States v. Romano*, 970 F.2d 164, 166–67 (6th Cir.1992), we had held that the enhancement of sentences under both

U.S.S.G. § 2F1.1(b)(2) and § 3B1.1 for the same conduct constituted improper double counting. In *Cobleigh*, we observed that the revised § 1B1.1, Application Note 4 did not merely authorize cumulative adjustments as a general matter, but specifically cited the enhancements at § 2F1.1(b)(2) and § 3B1.1 as an example of adjustments that were to be cumulatively applied.

lar to the presumption relied upon by the Fourth Circuit in *Williams, supra.* Given this supposed presumption, and given the absence of any language in § 2A2.2 that prohibits double counting, the Government concludes that we must reject Farrow's argument.

We do not read our precedents or § 1B1.1, Application Note 4 as broadly requiring double counting under all circumstances unless expressly prohibited by the Guidelines. As an initial matter, the plain language of the Application Note speaks of "adjustments from different guideline sections," and says nothing about the cumulative use of the same conduct to both establish a base offense level and apply an enhancement. Because this case does not involve multiple enhancements, *Cobleigh* is not controlling here.

Moreover, in cases decided after the Application Note was amended, we have continued to consider whether a sentence reflects impermissible double counting of the same conduct for two different purposes. For example, in *United States v. Perkins*, 89 F.3d 303, 307–10 (6th Cir.1996), we upheld the application of four separate increases to the defendant's offense level under U.S.S.G. § 2B3.1(b), finding that each of these enhancements "penalize[d] distinct aspects" of the defendant's conduct. Indeed, *Perkins* expressly quoted the revised Application Note 4 in support of its double counting analysis, yet still asked whether each adjustment properly arose from distinct conduct or consequences. Thus, we concluded our discussion in *Perkins* by stating the general rule that "no double counting occurs where, although the conduct underlying two enhancements is the same, a single guideline provision requires the district court to increase the defendant's sentence based on different aspects of the defendant's conduct." 89 F.3d at 310; *see also United States v. Kelley Technical Coatings, Inc.*, 157 F.3d 432, 443–44 (6th Cir.1998) (rejecting a claim of double counting where different conduct was used to determine the

base offense level and to apply an enhancement); *United States v. Wall*, 92 F.3d 1444, 1453 (6th Cir.1996) (same), *cert. denied*, 519 U.S. 1059, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997).

■ Plainly, then, we have not viewed the revised § 1B1.1 as foreclosing any further inquiry into double counting. Indeed, despite the intervening amendment to § 1B1.1, we cited the Second Circuit's *Hudson* decision with approval in a case coincidentally by the same name, *United States v. Hudson*, 53 F.3d 744 (6th Cir.), *cert. denied*, 516 U.S. 890, 116 S.Ct. 235, 133 L.Ed.2d 163 (1995). In our *Hudson* decision, we addressed a double counting concern inherent in U.S.S.G. § 2B3.1, the guideline governing robbery. One of the defendants, McPherson, argued that his sentence reflected improper double counting by including an enhancement under § 2B3.1(b)(2)(C) for possessing or brandishing a firearm, plus an enhancement under § 2B3.1(b)(5) for carjacking, which includes as an element the possession of a firearm. 53 F.3d at 748.

We concluded that we were not squarely confronted with a double counting issue, because McPherson had not merely possessed a gun, but had "point[ed] a shotgun at a victim for some period of time and threaten[ed] to 'blow him in two.'" 53 F.3d at 749. This additional, "qualitatively different" act of brandishing a weapon, beyond the mere possession sufficient to warrant application of the carjacking enhancement, ensured that the two enhancements to McPherson's sentence stemmed from two different aspects of his conduct. 53 F.3d at 749. Thus, we rejected McPherson's appeal to the Second Circuit's ruling in *Hudson*, while suggesting that we might follow it under the appropriate circumstances:

The [Second Circuit] held that application of the ["otherwise used"] enhancement would result in "impermissible double counting." The court's reasoning revolved around the fact that the guidelines have special provi-

sions to cover situations when the use of an ordinary object as a dangerous weapon transforms a minor assault into an aggravated one. **Therefore, it would be "double counting" if the same act that raised the base offense level were the basis of an enhancement also.**

This case would support [McPherson's] position if the question was ... possession plus possession. However, **because McPherson committed two distinct acts, possession plus brandishing**, allowing the enhancement to stand in this case is not contrary to *Hudson*.

53 F.3d at 749 n. 4 (emphasis added).

Given these precedents, we believe ourselves free to follow *Hudson* if persuaded that the Second Circuit's approach is correct. In considering this question, we acknowledge that other Circuits which have addressed the § 2A2.2 double-counting issue have declined to follow *Hudson*, for a variety of reasons. For example, in *United States v. Dunnaway*, 88 F.3d 617, 619 (8th Cir.1996), the Eighth Circuit found that ordinary objects raise no special double counting concern when treated as dangerous weapons under § 2A2.2 because, in the Court's view, it is possible to commit an aggravated assault with such an object by evincing an "[i]ntent to do bodily harm" through "conduct that falls short of actual use of the object."[13] Thus, the Court reasoned that it is appropriate to apply the four-level "otherwise used" enhancement when the assailant proceeds to actually use the object as a weapon.

In *United States v. Johnstone*, 107 F.3d 200, 212 (3d Cir.1997), a case involving an assault with a flashlight, the Third Circuit similarly found no double counting in light of the distinction in § 2A2.2 between general "involvement" of a dangerous weapon, which qualifies the offense as an "aggravated assault," and the various, more specific types of "involvement"—brandishing, otherwise using, or firing—that trigger application of the § 2A2.2(b)(2) enhancements. The Court also reasoned, as the Fourth Circuit did in *Williams, supra,* that it should not deviate from any double counting mandated by the plain language of the Guidelines, given the recognition in other portions of the Guidelines that double counting may occur and the existence of Guideline provisions that specifically forbid double counting under certain circumstances. 107 F.3d at 212–13; *see also United States v. Sorensen*, 58 F.3d 1154, 1161 (7th Cir.1995) (also adopting the Fourth Circuit's reasoning in *Williams*, in a case involving an assault with a concrete block).

Finally, in *United States v. Reese*, 2 F.3d 870, 895–96 (9th Cir.1993), *cert. denied*, 510 U.S. 1094, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994), the Ninth Circuit also declined to follow *Hudson*. *Reese* held that "the use of a single aspect of conduct both to determine the applicable offense guideline and to increase the base offense level mandated thereby will constitute impermissible double counting only where, absent such conduct, it is impossible to come within that guideline." 2 F.3d at 895. Because it is possible to commit an

---

**13.** The Court did not identify any specific examples of conduct involving an ordinary object that might be sufficient to constitute an aggravated assault, yet fall short of actual use of the object as a weapon. *Dunnaway* itself did not provide such an example, as the defendants in that case had actually used a bottle and their boots during their assault. 88 F.3d at 619. We also note that the spectrum of hypothetical assaults involving ordinary objects in ways insufficient to trigger a § 2A2.2(b)(2) enhancement is somewhat narrower than the Eighth Circuit's decision might suggest, because even brandishing or threatening to use the ordinary object as a weapon would trigger a three-level enhancement under § 2A2.2(b)(2)(C). To the extent the Eighth Circuit's ruling rests upon a determination that a § 2A2.2(b)(2) enhancement is not "automatic" in all cases where the weapon at issue is an ordinary object, we suspect that the universe of such cases where no enhancement applies is very sparsely populated, and we are aware of no case to date that lies within this category.

aggravated assault without the involvement of a dangerous weapon, the Ninth Circuit concluded that § 2A2.2 raises no double counting concerns. 2 F.3d at 896. The Court went on to dispute *Hudson*'s characterization of the sentence in that case as the product of "double counting":

> The relevant way to describe what is going on here is that the use of a weapon transformed Hudson's offense from a minor assault to an aggravated-assault-in-which-a-dangerous-weapon-was-otherwise-used. That we use a single sentencing factor "twice" to trace the effects of this transformation (first to distinguish minor from aggravated assaults, then to distinguish more and less culpable aggravated assaults) is merely an accidental by-product of the mechanics of applying the Guidelines. It is not impermissible double counting.

2 F.3d at 896 n. 32.

Upon surveying this authority in light of the facts of the case before us, we simply are not persuaded by the reasons given by these courts in support of double counting. As discussed above, we have not subscribed, as the Fourth Circuit has, to the broad principle that silence in the Sentencing Guidelines reflects implicit permission to double-count under all circumstances. Neither is there any support in our precedents for the Ninth Circuit's rule, which also appears to underlie the Eighth Circuit's decision in *Dunnaway*, that a guideline raises no double counting concerns so long as it is capable of being applied in some hypothetical case without counting the same conduct twice. Finally, we confess our inability to perceive how cases like this one do not "really" involve double counting, but instead reflect "merely an accidental by-product of the mechanics of applying the Guidelines."[14]

Consequently, we adhere in this case to our well-established rule that impermissible "double counting" occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways. *See Perkins*, 89 F.3d at 310. By observing this rule, we seek to advance one of the overarching purposes of the Sentencing Guidelines as set forth in an introductory Policy Statement: namely, to achieve "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G. Ch. 1, Pt. A, at 2; *see also Perkins*, 89 F.3d at 308, 310 (citing this policy statement in its double counting analysis). If a single aspect of the defendant's conduct both determines his offense level and triggers an enhancement, this defendant's final offense level will be the same as that of a defendant who engages in *two* forms of conduct deemed punishable under the Sentencing Guidelines.[15] Such an assign-

---

14. Our discussion here, and specifically our disagreement with the results reached by the Eighth and Ninth Circuits, necessarily is limited to cases where the same conduct is in fact used twice in sentencing, once to bring the offense within the aggravated assault guideline and once to trigger the "otherwise used" enhancement. We do not address the situation where the hypothetical case posited by the Eighth and Ninth Circuits actually occurs: that is, where two different aspects of conduct can be cited as the basis for using the aggravated assault guideline and applying the "otherwise used" enhancement. In *United States v. Morris*, 131 F.3d 1136, 1139 (5th Cir.1997), *cert. denied*, 523 U.S. 1088, 118 S.Ct. 1546, 140 L.Ed.2d 694 (1998), the Fifth Circuit found itself confronted with such a case, and thus declined to decide whether to follow the Second Circuit's ruling in *Hudson*, where defendant Morris used his vehicle in two separate ways, first by ramming an FBI agent's vehicle and then by driving his car "recklessly and at a high rate of speed to escape capture." Because no single aspect of Morris's conduct was used twice in his sentencing, *Morris* did not truly involve "double counting" as we have defined it, and our ruling here would not govern such a case.

15. For example, in this case, Farrow's sentence reflects the same base offense level and four-level enhancement as would apply to a defendant who *both* carried a firearm while assaulting a federal officer (thereby committing an "aggravated assault" under U.S.S.G. § 2A2.2) *and* "otherwise used" the firearm by, for example, pointing it directly at the officer (thereby subjecting him to a four-level enhancement under § 2A2.2(b)(2)(B)).

ment of equal offense levels for conduct of differing severities undermines the Guidelines' goal of proportionality in sentencing.

 Of course, our precedents show that not all instances of double counting are impermissible. For example, as demonstrated in *Cobleigh, supra,* we recognize that the Sentencing Guidelines expressly mandate double counting under some circumstances through the cumulative application of sentencing adjustments. Moreover, we allow double counting where it appears that Congress or the Sentencing Commission intended to attach multiple penalties to the same conduct. *Cf. United States v. Johnson,* 22 F.3d 106, 108 (6th Cir.1994) (finding that Congress intended to impose multiple punishments for the same conduct under 18 U.S.C. § 2119, which outlaws carjacking, and 18 U.S.C. § 924(c), which prohibits the use of a firearm in a crime of violence). These "exceptions" to our rule against double counting, if they can be characterized as such, derive from the principle that the Sentencing Guidelines "should be interpreted as if they were a statute," which in turn dictates that we "follow the[ir] clear, unambiguous language if there is no manifestation of a contrary intent." *United States v. Hayter Oil Co.,* 51 F.3d 1265, 1272 (6th Cir.1995) (quoting *United States v. Lewis,* 900 F.2d 877, 881 (6th Cir.1990)).

 Applying the foregoing principles to this case, and specifically to the interpretation of U.S.S.G. § 2A2.2 as applied to Farrow's sentence, we simply are not persuaded that this guideline was written in contemplation of the situation presented here, where a "dangerous weapon" is not dangerous at all unless it is "otherwise used." By defining an "aggravated assault" as encompassing a felonious assault that "involved ... a dangerous weapon," § 2A2.2, Application Note 1, the Sentencing Commission presumably meant to address situations where the "dangerous weapon" in question is sufficiently dangerous, by its very nature, that its mere "involvement" in an offense—for example,

the bare possession of a firearm—makes an otherwise minor assault fraught with peril, and hence "aggravated." Where, as here, the "weapon" in question is not inherently dangerous, there is nothing about its mere possession that would increase the peril associated with an assault. If, for example, Farrow had been standing next to his car and had charged at Agent Ward but done him little or no harm, we would not consider his offense an "aggravated assault" simply because he possessed an object (his car) that, under different circumstances, could have been used as a dangerous weapon.

Similarly, as the Second Circuit recognized in *Hudson,* the graduated enhancement scheme set forth at § 2A2.2(b)(2) seems to contemplate a weapon that, although dangerous when merely "involved" in the offense, creates an ever-increasing hazard as the defendant makes greater use of it. Through this scheme, we punish an assailant who injects a greater risk of harm by merely "involving" a dangerous weapon in his offense, and then we gradually increase this punishment as the assailant brings the weapon into play and escalates its use by brandishing, otherwise using (for example, pointing it at the victim's head), or discharging the weapon. Again, this scheme simply does not fit the situation where the weapon is an ordinary object. *Cf. United States v. Kushmaul,* 147 F.3d 498, 501–02 (6th Cir.1998) (noting that the gradually increasing penalties imposed by the Guidelines for increasing involvement or use of a firearm do not apply as well to other weapons). In such cases, we have no occasion to enhance the penalty to express our increased disapproval as the assailant makes increasing "use" of the object (whatever that might entail); we merely wish to punish his decision to use an ordinary object as an instrument of his assault. Having achieved this result by treating his assault as "aggravated," we ought not resort to an additional penalty under § 2A2.2(b)(2), absent some additional aspect of the assailant's

conduct that separately warrants it. *Cf. Morris, supra*, 131 F.3d at 1139 (finding an "otherwise used" enhancement warranted by two separate uses of a vehicle in the course of an assault).

We nevertheless would impose these additional penalties if persuaded that this is what Congress or the Sentencing Commission intended. The Government, however, has failed to suggest, nor have we identified, any policy that might be served by citing the use of a car in an assault as the basis for both setting a base offense level of 15 and applying a four-level "otherwise used" enhancement. *Compare Johnson, supra*, 22 F.3d at 108 ("Congress wanted to make sure in [18 U.S.C.] § 924(c) that all federal crimes of violence committed with a firearm are enhanced, even though the other more specific crime of violence also requires the presence of a firearm."). Absent evidence of any such legislative intent, and given our continuing vigilance to avoid double counting, we decline to presume that the Sentencing Commission anticipated the present situation and, through its silence, implicitly approved the use of the same conduct to both establish an aggravated assault and invoke the "otherwise used" enhancement.

Just as importantly, we do not find in the plain language of § 2A2.2 a clear mandate that the *"otherwise used"* enhancement should be applied to Farrow's sentence. Farrow did not "otherwise use" his car in his assault on Agent Ward, as distinct from the conduct that brought his offense within the "aggravated assault" guideline in the first instance. Rather, under the sentence imposed by the District Court, a single aspect of Farrow's conduct—namely, his act of using his car as a dangerous weapon by driving it at Agent Ward—was counted both to treat his offense as an "aggravated assault" with a base offense level of 15, and to apply a four-level enhancement under § 2A2.2(b)(2)(B) for "otherwise us[ing]" his car in his assault.

Although, as discussed above, other courts have declined to view this situation as involving double counting, we see no way of avoiding the conclusion that it was Farrow's *use* of his car, and no other aspect of his conduct, that triggered both the base offense determination and the application of the enhancement. In contrast to cases involving inherently dangerous weapons, Farrow's conduct in this case cannot meaningfully be divided into possession plus some separate "use" of a weapon. While mere possession of an inherently dangerous weapon would, in another case, qualify an offense as an aggravated assault, Farrow's mere possession of his car simply would not have led to this result, absent his use of the car in his assault.

Thus, Farrow's sentence is the product of "double counting" as we have repeatedly defined it in our precedents—that is, the use of the same aspect of his conduct for two sentencing purposes. Moreover, it is impermissible double counting, because we find no policy basis for the sentence imposed by the trial court in this case, and no evidence of any legislative intent that the use of a car should count twice in a sentencing determination. Accordingly, we conclude that Farrow's sentence must be vacated and redetermined without application of a four-level "otherwise used" enhancement.[16]

---

**16.** We express no view on the holding in *United States v. Couch*, 59 F.3d 171 (6th Cir. 1995), an unpublished decision cited in Judge Nelson's dissent as purportedly addressing the double counting issue under consideration here. The brevity of the discussion of double counting in *Couch*, as well as its limited recitation of the factual basis for the trial court's sentencing decision, precludes us from determining whether that case and this one involve similar circumstances. In particular, we cannot tell whether the District Court in *Couch* relied on factors apart from the use of a metal flashlight as a dangerous weapon in its decision to apply the aggravated assault guideline, nor whether the trial court might have concluded that the assailant's conduct went beyond a single "use" of the flashlight, where there was testimony that defendant Couch struck his victim "two or three times on the

## C. Enhancement of Farrow's Sentence Based on the Official Status of the Victim

Farrow next contends that the District Court erred in applying U.S.S.G. § 3A1.2 to enhance his sentence by three levels on account of the official status of the victim, Agent Ward.[17] Farrow contends that the evidence before the District Court was insufficient to support the conclusion that he knew or "ha[d] reasonable cause to believe," U.S.S.G. § 3A1.2(b), that one or more of the individuals approaching his car on the night of February 5, 1998 was a law enforcement officer. Because such actual or constructive knowledge is required to sustain a three-level enhancement under § 3A1.2, Farrow asks us to set aside this enhancement.

 We review for clear error the District Court's factual finding that Farrow either knew or had cause to believe that Agent Ward was a law enforcement officer. *See United States v. Hayes*, 135 F.3d 435, 437 (6th Cir.1998). This question is a close one, because portions of the record support the conclusion of the court below, while other portions seemingly lead to a contrary result. As evidence in support of the District Court's finding, we first note that both the post-arrest statement given by Farrow to the INS and witness testimony at trial reflect Farrow's awareness on the afternoon of February 5, 1998 that an INS agent had attempted to locate him earlier that day. In addition, Farrow testified at his sentencing hearing that he knew the INS was looking for him when he visited his wife's apartment on the night of February 5, and that he had been on the premises in West Farmington, Ohio earlier that day when Agent Ward visited and questioned his friend Don Malone about Farrow's whereabouts. (J.A. at 211–14.) Finally, Agent Ward testified that Farrow continued to accelerate his vehicle through the parking lot, with the INS agent perched on the hood, even after Ward and Agent Baskfield identified themselves by shouting out, "Police. Stop." (J.A. at 117–18.)

On the other hand, Farrow introduced evidence at trial and at his sentencing hearing which would tend to suggest his lack of awareness of the official status of the individuals who approached his car in the parking lot of his wife's apartment complex. First, it is undisputed that Agents Ward and Baskfield wore no clothing that would identify them as law enforcement officers, that they did not activate the police lights in their vehicle as they followed Farrow's car through the parking lot, and that they did not flash their badges or brandish their weapons as they approached Farrow in his car. Further, although Farrow admitted that he

---

right side of the head ... while the latter was face-down on the ground." 59 F.3d 171.

We further note that we share Judge Nelson's reluctance to embrace the full breadth of the Second Circuit's *Hudson* decision in all cases where ordinary objects are used as dangerous weapons. As indicated in the above discussion, not all such cases necessarily give rise to double counting, as different aspects of the defendant's conduct might bring an offense within the aggravated assault guideline and trigger application of a § 2A2.2(b)(2) enhancement. Neither do we believe, however, that we should adopt the equally broad but contrary view espoused by the Eighth and Ninth Circuits, and apparently shared to some degree by Judge Nelson in his dissent, that the aggravated assault guideline is immunized from double-counting analysis in all

cases because it is capable of being applied in some cases without double counting.

17. U.S.S.G. § 3A1.2 provides:
 If—
 (a) the victim was a government officer or employee; a former officer or employee; or a member of the immediate family of any of the above, and the offense of conviction was motivated by such status; or
 (b) during the course of the offense or immediate flight therefrom, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating a substantial risk of serious bodily injury,
 increase by **3** levels.

was present when Agent Ward questioned his friend Don Malone about his whereabouts, he denied having checked to see what Agent Ward looked like; rather, at the time the INS agent approached Farrow's car at the apartment complex, he testified that he had "never seen [Agent Ward] before in my life," (J.A. at 217), and that he did not know any of the people who surrounded his car, (J.A. at 204). Finally, Farrow offered testimony, both his own and Stanley Allison's, reflecting his concerns as he visited his wife on the night of February 5, including: (i) that his wife's request that he drop by "might be some kind of a set up," (J.A. at 144); (ii) that he previously had been threatened by his wife's neighbor as a result of an incident where he had touched a neighborhood girl on the back of her head, (J.A. at 201–02); and (iii) that when four unknown individuals approached his car at his wife's apartment complex, "I thought I was going to get beat up or robbed, or something," (J.A. at 203–04).

In determining that these facts warranted the application of § 3A1.2, the District Court reasoned as follows:

> [T]here is motivation here for [Farrow] to regard agents of the Immigration Service in a way different than you might or I might under these circumstances.

> I believe that the defendant probably did have some apprehension in going to the location of this activity. I think it's probably reasonable that he did have some fears of the area and the hour of the day, and possibly some perceived reason for his being there. Admitting that there was something in his past life experience, if you will, which would justify that feeling, generally there is nothing in the evidence which suggests to me that anything justifies his doing what he did by virtue of that apprehension.

> But there is also every reason to believe that he should have known that INS agents were the parties who approached the car.

> I'm not sure that the apprehension about the agents predominates over the apprehension about others, but the fact of the matter is, there is every reason for him to have know[n], based on the history of the case, which involves him, and according to the evidence that was produced during trial and here today, there is every reason for him to believe and know that the parties who approached the car were the agents of the immigration service.

> He knew that they were looking for him. He had been told that, he was informed that they were looking for him. He knew that the application which he was to make to stay in the United States was, if you will, either defective or not made at all. And the motivation, as I said, for him to stay here was a very strong one.

> The very fact that he may have been apprehensive about others does not preclude his awareness. It was highly likely that INS agents were there either to question him or to apprehend him or to deal with him in some fashion. And I believe that the evidence establishes that that is so.

> Why do I say that? Well, first of all, the jury saw it that way, but on an individual basis, the court joins that view, drawing the appropriate inferences from the evidence which was offered, which I suppose one could say was in the form of circumstantial evidence, to say that he was not fearful of the intrusion of the INS agents. To put it another way, I think, is naive. And I believe that he was. And I find as fact those matters which I have stated and with that conclusion.

(J.A. at 223–25.)

■■ As Farrow correctly points out, a portion of the District Court's analysis cannot withstand scrutiny. Specifically, there is no basis for concluding that "the jury saw it that way" where, as explained earlier, a conviction under 18 U.S.C. § 111

does not require a showing that the defendant was aware of the victim's official status. *See Boone, supra,* 738 F.2d at 765. Accordingly, the jury verdict provides no basis for determining, one way or the other, whether Farrow knew or had reason to believe that Agent Ward was a law enforcement officer.

■ Nevertheless, despite this flaw in the District Court's reasoning, we find no basis for rejecting the lower court's ultimate factual finding. Mindful of the "clearly erroneous" standard governing our review, we may not reverse the District Court's factual findings based· solely on a belief that we would have reached a different result. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). As the *Anderson* Court instructed:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

470 U.S. at 573–74, 105 S.Ct. at 1511. The Court further explained that "[t]his is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." 470 U.S. at 574, 105 S.Ct. at 1511–12.

The rule stated in *Anderson* governs the situation before us. The evidence presented to the District Court permitted two contrary conclusions: one, that Farrow had reason to believe that the individual who approached his car was the INS agent who had been looking for him earlier that day, or, two, that Farrow honestly feared an assault by unidentified and unknown individuals in a parking lot after dark. The facts of this case are not like those confronting us in *Hayes, supra,* 135 F.3d at 438–39, where we noted that one of the officers "was wearing a police jersey with 'Police' written across the front in big white letters and a police hat," and that the officers had activated the police lights in their unmarked vehicles. Neither, however, is this a case like the one cited by Farrow, *United States v. Gonzales,* 65 F.3d 814, 818 (10th Cir.1995), *rev'd on other grounds,* 520 U.S. 1, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), where an undercover officer affirmatively and successfully assured the defendants that he was *not* a police officer.

■ The facts of this case are much more equivocal, and do not admit of only a single conclusion. In determining that Farrow knew or had reason to believe that Agent Ward was a law enforcement officer, the District Court adopted one of the two permissible views of the evidence. Under the clearly erroneous standard of review, we cannot overturn this finding of fact. Accordingly, we affirm the District Court's three-level enhancement of Farrow's sentence for the official status of the victim.[18]

---

**18.** Judge Moore's dissent on this issue rests in part on an argument that she concedes was not raised by Farrow, either at sentencing or in his brief on appeal—namely, that U.S.S.G. § 3A1.2(b) should not apply because Farrow did not commit "another offense" in addition to his aggravated assault on Agent Ward. "Generally, a failure to object at sentencing forfeits any challenge to the sentence on appeal." *United States v. Barajas–Nunez,* 91 F.3d 826, 830 (6th Cir. 1996). We may overlook such a forfeiture to correct a "plain error," but we "are not required to do so." *Id.* Among our reasons for questioning the propriety of such discretionary review here, we note that Farrow's failure to raise this argument below deprived the District Court of any opportunity to identify "another offense" that would satisfy Judge Moore's construction of § 3A1.2(b). Because Farrow never argued that "another offense" was necessary, it is hardly surprising that the sentencing court made no findings on the existence or absence of any such offense. Further, by omitting this argument from his brief on appeal, Farrow avoided his burden of identifying a "plain error" that

## D. Denial of a Downward Departure for Farrow's Alien Status

■ As his final argument on appeal, Farrow asserts that the trial court erred in refusing to grant a downward departure in Farrow's sentence on account of his alien status. The Government responds that this issue is not reviewable on appeal, and that, in any event, the District Court properly exercised its discretion in declining to grant the departure sought by Farrow. We agree with the Government's first argument, and thus do not reach the second.

■ As the Government notes, we have held that "the refusal of a district judge to make a downward departure is not ordinarily appealable." *United States*

*v. Byrd*, 53 F.3d 144, 145 (6th Cir.1995). Such a decision may be appealed only where the lower court's refusal to deviate from the sentencing guidelines was based on an erroneous belief that it lacked the authority to do so. *See United States v. Landers*, 39 F.3d 643, 649 (6th Cir.1994). Moreover, we presume that district judges are aware of their discretion under the sentencing guidelines. Thus, the sentencing judge is under no duty to "state affirmatively that he knows he possesses the power to make a downward departure, but declines to do so," and we "should be reluctant to 'treat as ambiguous' a ruling which does not" include such an affirmative declaration. *Byrd*, 53 F.3d at 145

affected his "substantial rights" and "seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir.1998); *see also United States v. Phibbs*, 999 F.2d 1053, 1080 n. 12 (6th Cir. 1993) (noting that "it is not our function to craft an appellant's arguments").

In any event, were we to reach the issue, we would find no error, plain or otherwise, in the District Court's decision to apply the "official victim" enhancement. Section 3A1.2(b) requires only that the defendant assault a law enforcement officer "during the course of **the offense** or immediate flight therefrom." If Application Note 5 to this section were read as imposing an additional requirement in all cases that "the offense" must be "another offense" apart from aggravated assault, then we would be obliged to follow the Guideline itself over any inconsistent commentary. *See Stinson v. United States*, 508 U.S. 36, 43, 113 S.Ct. 1913, 1918, 123 L.Ed.2d 598 (1993). We do not believe, however, that Application Note 5 is inconsistent with § 3A1.2(b). Rather, this Note apparently is intended to clarify that the Guideline applies even where, unlike here, the assault on a law enforcement officer occurs "proximate in time to the commission of," but distinct from, "another offense" that might not typically involve an official victim—for example, bank robbery. Given the clear overarching purpose of § 3A1.2 to enhance the penalty in cases involving official victims, the Sentencing Commission might have believed it unnecessary to confirm in Note 5 that the enhancement also applies where the offense itself *does* involve an official victim. Certainly, in two other circumstances where the Sentencing Commission sought to preclude the application of § 3A1.2, it said so in

the plainest possible language. *See* U.S.S.G. § 3A1.2, Application Note 3 ("Do not apply this adjustment if the offense guideline specifically incorporates this factor."); U.S.S.G. § 2A2.4, Application Note 1 ("[D]o not apply § 3A1.2 (Official Victim) unless subsection (c) requires the offense level to be determined under § 2A2.2 (Aggravated Assault).")

In our judgment, this interpretation of Application Note 5 not only comports with the language and purpose of § 3A1.2, but avoids two anomalies introduced by the dissent's approach. As Judge Moore concedes, her reading of Application Note 5 would absolve Farrow of any additional penalty for assaulting a federal officer rather than an ordinary citizen, in violation of the apparent purpose of § 3A1.2. Moreover, the dissent's construction would lead to disproportionate sentences for defendants who commit identical assaults on federal officers, depending on whether these assaults were or were not accompanied by "another offense." In the former case, the defendant would be subject to prosecution for the "other offense" plus assault on a federal officer in violation of 18 U.S.C. § 111, and his sentence for the assault would be subject to the "official victim" enhancement. In the latter case, by contrast, the defendant's sentence for the assault alone could not be enhanced under § 3A1.2(b), by virtue of the absence of "another offense." The assaults in the two cases could be identical in every way, and thus would represent identical violations of § 111, yet the two defendants' sentences for this same offense would differ. Nothing in § 3A1.2 or its Application Notes suggests that the Sentencing Commission intended the Guideline to operate in this fashion, and we see no policy basis for these disproportionate results.

(quoting *United States v. Barrera–Barron*, 996 F.2d 244, 245 (10th Cir.1993)).

In this case, the record affirmatively reflects the District Court's knowledge of its authority to grant the departure sought by Farrow. After hearing the argument of Farrow's counsel that alien status is a proper basis for a downward departure, the Court responded that "I think there are times when it can" provide a basis for departure, but that "I simply don't think these circumstances warrant" such a departure. (J.A. at 229.) This statement plainly and unambiguously evinces the District Court's awareness of its discretionary power to depart, and therefore precludes our review of the sentencing judge's decision not to grant a downward departure in this case.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the conviction and sentence of Defendant/Appellant David J. Farrow in all respects, with the exception of the four-level enhancement applied to his sentence as a result of impermissible double counting. In light of this sentencing defect, we VACATE Farrow's sentence and REMAND this case to the District Court for resentencing as to the double counting issue only, in accordance with this opinion.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts IV A, C, and D of the majority opinion, but not in Part IV B. I see no impermissible "double counting" in the calculation of defendant Farrow's three-year sentence, and I would affirm the sentence in all respects.

Mr. Farrow's sentence reflects the use—concededly an appropriate use—of the base offense level (15) called for by U.S.S.G. § 2A2.2(a) and a 4–level enhancement under U.S.S.G. § 2A2.2(b)(2). The 4–level increase was mandated by the plain language of the guideline: "If a firearm was discharged, increase by 5 levels; (B) if

a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels...." The district judge simply applied the guideline as written—and no fewer than nine of our sister circuits would agree with his decision to do so. See *United States v. Valdez–Torres*, 108 F.3d 385 (D.C.Cir.1997); *United States v. Garcia*, 34 F.3d 6 (1st Cir.1994); *United States v. Johnstone*, 107 F.3d 200 (3d Cir.1997); *United States v. Williams*, 954 F.2d 204 (4th Cir.1992); *United States v. Morris*, 131 F.3d 1136 (5th Cir.1997); *United States v. Sorensen*, 58 F.3d 1154 (7th Cir. 1995); *United States v. Dunnaway*, 88 F.3d 617 (8th Cir.1996); *United States v. Reese*, 2 F.3d 870 (9th Cir.1993); and *United States v. Duran*, 127 F.3d 911 (10th Cir.1997).

Our own court, in an unpublished opinion, has likewise held that the guideline means what it says and should be applied accordingly. See *United States v. Couch*, 59 F.3d 171 (6th Cir. 1995). The defendant in that case was a police officer who had struck a suspect in the head with a metal flashlight. The officer was assigned a base offense level of 15 for "aggravated assault" and was given a 4–level increase under § 2A2.2(b)(2)(B) for use of a dangerous weapon. His claim that this constituted "double counting" was rejected out of hand:

> "The language of the aggravated assault provision clearly provides for a calibrated adjustment of the offense level according to the use made of the dangerous weapon and, as such, *does not double count.*" *Couch*, 59 F.3d 171 (emphasis supplied).

Until today, the Court of Appeals for the Second Circuit was the only circuit court to have gone on record as holding that in a situation where the dangerous weapon used by the defendant was something other than a firearm, the guideline should not be applied as written. See *United States v. Hudson*, 972 F.2d 504 (2d Cir.1992). The Second Circuit got it wrong in *Hudson*, I believe, and all of the other circuits

that have addressed the issue—including ours, until now—have got it right.

The crux of the Second Circuit's reasoning in *Hudson* is found in the two paragraphs immediately preceding the court's statement of its conclusion:

"A defendant can not be guilty of assault with a non-inherently dangerous weapon (such as a chair or an automobile) unless the object is used (or its use is threatened) in a dangerous way. In such instances, it is the use or threatened use of the object which makes the assault aggravated, **thereby increasing the base level offense**, and, this same act also requires an upward adjustment of *three or four levels under U.S.S.G. § 2A2.2.*"

"The incremental adjustment schedule of § 2A2.2, see 2A2.2(b)(1)-(4), is, therefore, only appropriate for situations involving inherently dangerous weapons, because under the Guidelines a defendant could be sentenced at the base offense level for carrying a firearm while committing an assault. Where an ordinary object is implicated, as was the case here, it is the *use* of the object as a weapon that makes the offense an aggravated assault, and it is the use of this weapon which also requires a four-level enhancement pursuant to U.S.S.G. § 2A2.2(b). **This twofold upward adjustment for the *use* of a weapon constitutes impermissible double counting.** See, e.g., *United States v. Campbell*, 967 F.2d 20, 23–26 (2d Cir.1992)." *Hudson*, 972 F.2d at 507. (Italics in original, bold type supplied.)

The Second Circuit evidently thought that the use of an automobile as a weapon somehow "increas[ed] the base" offense level so that the end result, after the imposition of a 4-level enhancement for use of the weapon, would constitute a "two-fold upward adjustment." But, as other courts have pointed out, it is not correct to think of the sentencing court as "increasing" or making an "upward adjustment" in the offense level when the court invokes § 2A2.2(a) to fix the base offense level at 15. You have to start somewhere, of course, and the base offense level—which does not necessarily turn on the use of any weapon at all, whether "inherently" dangerous or otherwise—simply marks the starting point of the calculation. The guideline calls for only one upward adjustment, not two.

It is true that a lower starting level— one prescribed by U.S.S.G. § 2.A2.4— would have been called for under Appendix A of the guidelines if defendant Farrow's violation of 18 U.S.C. § 111 had not constituted an "Aggravated Assault" as that term is defined in the guidelines. It is also true that the aspect of Mr. Farrow's conduct which made his crime an aggravated assault in the first place, under the guidelines definition, was the fact that he committed his felonious assault with a dangerous weapon and with intent to do bodily harm. But so what? Mr. Farrow could have committed an aggravated assault without using any weapon at all—and if he had done so, his base offense level would still have been 15. The Sentencing Commission obviously wanted to distinguish between aggravated assaults involving use of a dangerous weapon and aggravated assaults not involving use of a dangerous weapon.

The Sentencing Commission's right to make such a distinction seems self evident. Surely the Second Circuit could have had no objection to a guideline saying that the base offense level for an aggravated assault in which any kind of dangerous weapon was used would be 19, if there was an intent to do bodily harm, while the base offense level for an aggravated assault not involving the use of a dangerous weapon would be 15. The Sentencing Commission happens to have used a different mechanism for distinguishing among aggravated assaults and calibrating the punishment therefor, but the mechanism chosen by the Commission as a calibration device seems entirely appropriate to me.

The Court of Appeals for the District of Columbia Circuit made the point very cogently in *Valdez–Torres*:

> "Section 2A2.2 applies to different types of aggravated assault, of which assault with a dangerous weapon is but one. The enhancement for use of a dangerous weapon thus does not duplicate an essential element of aggravated assault but instead is properly used to distinguish among sentences imposed pursuant to the section for different kinds of assaults." 108 F.3d at 389 (Footnotes omitted).

What the *Valdez–Torres* court was suggesting, I believe, is that the Second Circuit fell into error in *Hudson* by ignoring the structure of the relevant guideline. U.S.S.G. § 2A2.2 applies to *any* aggravated assault, defined as any felonious assault that involved "(a) a dangerous weapon with intent to do bodily harm ..., *or* (b) [that involved] serious bodily injury, *or* (c) [that involved] an intent to commit another felony." Application Note 1, U.S.S.G. § 2A2.2 (emphasis supplied). The perpetrator of *any* type of aggravated assault starts out with an offense level of 15, as we have seen, whether a dangerous weapon was involved or not. And within the aggravated assault universe, there is one type of assault—the type identified in Application Note 1(c)—for which, depending on the circumstances of the individual case, the perpetrator may receive no offense level increase at all. The Sentencing Commission has decided that there should be a 3–level increase if the perpetrator brandished or threatened to use any kind of dangerous weapon, a 4–level increase if he actually did use a dangerous weapon of any kind (or if he inflicted serious bodily injury), and a 5–level increase if the use of the weapon consisted of discharging a firearm.

The *Hudson* court acknowledged that this sort of "incremental adjustment schedule" is appropriate for situations involving firearms. Because of the court's failure to focus on the fact that some types of aggravated assault do not involve weapons of any kind, however, *Hudson* rejected the incremental adjustment scheme as not "appropriate" for situations involving the use as a weapon of an "ordinary object" such as an automobile. I should have thought, I must say, that the appropriateness of establishing an incremental adjustment scheme applicable to the use of "ordinary" objects as weapons is precisely the sort of question that Congress expected the Sentencing Commission to decide.

In the case at bar, the end result of the process decided on by the Commission was a sentence—three years' imprisonment—the length of which did not exceed the maximum that would have been permissible under 18 U.S.C. § 111(a) without regard to the enhanced penalty ("not more than ten years") authorized in § 111(b) for situations where a deadly or dangerous weapon was used. The length of Mr. Farrow's sentence happens to be identical to that of the sentence imposed in *Valdez–Torres*. And the particulars of the crime committed by the defendant in *Valdez–Torres*—assaulting an INS agent with an automobile—are identical to the particulars of the crime committed by Mr. Farrow. A three-year sentence is a punishment that fits this crime reasonably well, in my opinion. Accordingly, and on the strength of the reasoning employed by the D.C. Circuit in *Valdez–Torres*, I would reject the defendant's double-counting argument.

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's decision that the evidence adduced at trial was sufficient to sustain Farrow's conviction under 18 U.S.C. § 111(b). I also agree with the majority that the district court's decision not to grant a downward departure based on Farrow's alien status is not reviewable in this case. Furthermore, I agree with Judge Rosen's conclusion that the district court impermissibly engaged in

double counting by adding a four-level enhancement to Farrow's sentence on the ground that he "otherwise used" a dangerous weapon, *see* U.S.S.G. § 2A2.2(b)(2)(B), and I fully concur in his analysis of that issue. I disagree, however, with the majority's decision in Part IV.C. to uphold the district court's application of the three-level enhancement under U.S.S.G. § 3A1.2, based on the official status of the victim. Because I believe that U.S.S.G. § 3A1.2(b) was not intended to apply to the circumstances of this case, and because, alternatively, I believe that the government did not meet its burden of showing that Farrow knew or should have known that Ward was a law enforcement officer, I respectfully **DISSENT** from Part IV.C. of the majority's opinion.

I believe that, as a matter of law, it was improper for the district court to apply § 3A1.2(b) to the appellant. By its terms, Application Note 5 to § 3A1.2 contemplates an enhancement under subdivision (b) only when the assault on a federal officer occurs during the course of or during immediate flight from *another* offense. Application Note 5 reads:

> Subdivision (b) applies in circumstances tantamount to aggravated assault against a law enforcement or corrections officer, committed in the course of, or in immediate flight following, *another* offense, such as bank robbery. While this subdivision may apply in connection with a variety of offenses that are not by nature targeted against official victims, its applicability is limited to assaultive conduct against law enforcement or corrections officers that is sufficiently seri-

ous to create at least a "substantial risk of serious bodily injury" and that is proximate in time to the commission of the offense.

U.S.S.G. § 3A1.2 commentary, applic. note 5 (emphasis added). Thus, the clear language of Application Note 5 indicates that § 3A1.2(b) should not apply when the underlying offense is aggravated assault on a federal officer.

The language of § 3A1.2(b) also supports the view that that provision should not apply where the underlying offense is aggravated assault. Subdivision (b) clearly provides for an enhancement when the defendant, "during the course of the offense or immediate flight therefrom," engages in what amounts to aggravated assault against a law enforcement or corrections officer. It is nonsensical, or at least tautological, to say that, while committing the offense of aggravated assault against Ward, Farrow engaged in aggravated assault against Ward. Reading the Sentencing Guidelines to dictate such a result strongly resembles the kind of double counting disapproved by Part IV.B. of the court's opinion, which I join. Furthermore, the Eleventh Circuit agrees that § 3A1.2(b) does not apply when the underlying offense is aggravated assault on a federal officer, relying on the language of Application Note 5. *See United States v. Jennings*, 991 F.2d 725, 734 (11th Cir.1993). *But see United States v. Valdez–Torres*, 108 F.3d 385, 390 (D.C.Cir.1997) (reading § 3A1.2(b) to apply to aggravated assault on an INS agent).[1]

---

**1.** At oral argument, the government suggested that the district court relied on § 3A1.2(a), which provides for an enhancement when the underlying offense is "motivated by" the official status of the victim, rather than on § 3A1.2(b). This assertion is incorrect. A review of the transcript of the sentencing hearing indicates that both the court and counsel focused in that hearing on Farrow's knowledge, not his motivation. Furthermore, the Presentence Investigation Report named § 3A1.2(b) as the basis for the enhancement,

J.A. at 251, and the minutes of the criminal proceedings clearly indicate that the district court "adopt[ed] the findings and guidelines application in the Presentence Report" with respect to that issue, J.A. at 82. Counsel for the government also suggested that remaining illegally in the country, rather than aggravated assault, was the "other offense" during the course of which Farrow assaulted Ward, thus invoking the enhancement under § 3A1.2(b). A review of the sentencing transcript, however, indicates that the district court made no

This reading of § 3A1.2(b) raises the problem that Farrow would receive the same sentence for assaulting a federal officer as he would for aggravated assault on any other citizen. This difficulty results from the fact that § 2A2.2, the guideline that establishes the base offense level for aggravated assault, does not contain any means of specifying a higher offense level if the assault occurred on an officer. It is nonetheless plausible that the official-victim enhancement under § 3A1.2 was intended to apply in cases of aggravated assault only when subsection (a) of § 3A1.2 is invoked—that is, only when the assault on the victim is "motivated by" the victim's official status. U.S.S.G. § 3A1.2(a).[2] Although such a policy might seem unwise or unusual, it is, in my opinion, dictated by the plain language of Application Note 5, which is binding on this court unless it is unconstitutional, plainly erroneous, or inconsistent with the Guidelines. *See Stinson v. United States*, 508 U.S. 36, 45–47, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993). I believe that the majority's understanding of the "clear overarching purpose" of § 3A1.2, slip op. at 198 n. 18, should not trump the dictates of that plain language.[3]

Admittedly, the appellant did not raise this argument, either in his appellate brief or at sentencing, when he objected to the official-victim enhancement. Normally, the appellant's failure to make an argument in the district court or in his brief

would preclude this court from reversing on that ground. *See, e.g.*, FED. R.APP. P. 28(a); *United States v. Brown*, 151 F.3d 476, 487 (6th Cir.), *cert. denied*, — U.S.—, — U.S. ——, 119 S.Ct. 560, 142 L.Ed.2d 466 (1998). That rule is not jurisdictional, however, and we have previously held that it "may be waived in exceptional cases or to avoid a miscarriage of justice." *Mayhew v. Allsup*, 166 F.3d 821, 823 (6th Cir.1999); *see Dorris v. Absher*, 179 F.3d 420, 425 (6th Cir.1999); *United States v. Anderson*, 584 F.2d 849, 853 (6th Cir.1978) (citing FED. R.APP. P. 2). In my view, lengthening the duration of the appellant's incarceration based on a sentencing guideline that is, by its terms, inapplicable to him constitutes a fundamental miscarriage of justice. Furthermore, as in *Dorris*, the issue in this case is the district court's erroneous interpretation of a statute; it concerns a pure question of law, and no material facts are in dispute. *See Dorris*, 179 F.3d at 425–26. Thus, this court is in a position to exercise its discretion to decide that legal issue. It is true, as the majority points out, that, due to Farrow's failure to raise this argument at sentencing, the district court did not have the opportunity to consider whether Farrow committed any other offense while assaulting Ward that would satisfy the requirements for applying § 3A1.2. *See* slip op. at 198 n. 18. However, there is no reason why

findings with respect to the legality of Farrow's presence in this country for the purposes of the sentencing enhancement.

2. As the D.C. Circuit has pointed out, Application Note 1 to § 2A2.4 (Obstructing or Impeding Officers) instructs the sentencer to apply the official-victim enhancement of § 3A1.2 if the conduct amounts to aggravated assault. *See Valdez–Torres*, 108 F.3d at 390. However, this requirement is not inconsistent with the reading of § 3A1.2 that I have suggested: nothing in the language of Application Note 1 to § 2A2.4 requires a three-level enhancement in every case of aggravated assault on an officer or prohibits following the additional requirements imposed by the language of § 3A1.2(a) and § 3A1.2(b) before giving that enhancement. Indeed, the reference to

§ 3A1.2 in Application Note 1 to § 2A2.4 suggests that all the requirements and limitations of § 3A1.2 should be observed.

3. The majority suggests that another difficulty with my reading of § 3A1.2 is that defendants who engage in "identical assaults on federal officers" would receive different sentences, depending on whether those assaults were committed in the course of another offense. Slip op. at 198 n. 18. I see nothing anomalous, however, in concluding that a defendant who assaults an officer in the course of committing a separate crime is more culpable or more in need of deterrence than a defendant who assaults an officer while committing no other crime and who is not motivated by the officer's official status in committing the assault.

this court could not permit the district court to do so during resentencing. *See generally United States v. Moore*, 131 F.3d 595, 597–99 (6th Cir.1997) (noting the appellate courts' broad power to issue general or limited remands, depending on the circumstances of each particular case). For these reasons, I would hold that the district court erred in using § 3A1.2 to enhance Farrow's sentence.

In the alternative, I would hold that the government did not, in any case, meet its burden of showing by a preponderance of the evidence that Farrow knew or should have known that Ward was a law enforcement officer. The district court's finding that there was sufficient evidence of Farrow's knowledge of Ward's official status appeared to be based primarily on the fact that Farrow was informed that an INS agent was looking for him earlier in the day. As the district court acknowledged, however, Farrow likely had some apprehension about the neighborhood and the late hour, and therefore would not necessarily expect that the four individuals approaching his vehicle were on official business. Furthermore, there was no evidence that Farrow knew what Agent Ward looked like. As Farrow pointed out, if he had hit either the process server or the friend, both of whom were nearby, this would not even be a federal case. It stretches credulity to charge Farrow with reasonable knowledge not only that one of the individuals approaching his vehicle was an INS agent—based on his knowledge that the INS was looking for him—but also that *the particular individual whom he ultimately hit* was an INS agent. Moreover, as the majority acknowledges, the district court misinterpreted the jury's verdict when it indicated, with respect to Farrow's knowledge, that "the jury saw it that way." The jury found only that Farrow intentionally acted to hit the man in front of him and that that man was a federal officer. Indeed, the government explicitly relied in its closing argument on the fact that it did *not* have to prove that Farrow knew Ward was an INS agent.

Therefore, I would hold that the district court's finding that Farrow knew or should have known that Ward was an INS agent was clearly erroneous, and I would vacate that portion of Farrow's sentence as well.

For the foregoing reasons, I respectfully **DISSENT** from the Part IV.C. of the majority's opinion. I concur fully in the remainder of Judge Rosen's opinion.