**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gary ADAMS, Defendant–Appellant.**

**No. 99–4123.**

United States Court of Appeals,
Sixth Circuit.

Feb. 26, 2002.

Before BATCHELDER and RYAN, Circuit Judges, and LAWSON,* District Judge.

BATCHELDER, Circuit Judge.

A jury found Defendant Gary Adams guilty of twenty-five counts of theft of public funds, in violation of 18 U.S.C. § 641. He appeals this verdict, arguing that under the evidence presented at his trial no rational jury could have found him guilty; that the Social Security checks he was found guilty of stealing could not have been stolen from the United States because they were no longer United States' property; that the district court erred in calculating the date on which his thefts began; and that the district court should have granted him a downward departure because his criminal history was over-represented in his sentencing. Finding no merit to Adams's claims, we will affirm the judgment of the district court.

### Statement of Facts

On June 1, 1996, the Social Security Administration sent a letter to Walter Dunson, the ninety-six-year-old father of Defendant Adams, telling Dunson that an Administration field representative would be visiting him at home in a few days to make sure that he was receiving his Social Security benefits, and to see that the money was being handled properly. The visit, however, never took place: five days later, on June 5, Adams called the police from Findlay Market in the Over–the–Rhine area of Cincinnati, reporting that Dunson had wandered away after Adams had left him alone for a moment while the two were shopping. Because of Dunson's advanced years, the police took immediate and thorough action, searching the area

door-to-door and canvassing extensively and for several days. But aside from yielding one witness who recalled seeing an old man wandering around, the search was fruitless.

Several circumstances about the case, including Adams's conduct, were unusual, leading the police to wonder whether Adams had been lying when he reported his father's disappearance. When the police first responded to his call on June 5, Adams was unemotional and impatient to leave to pick up his wife from work, and he rejected an officer's offer to run the errand for him so that he could continue to search. Later, after several unsuccessful attempts to contact Adams, the police managed to arrange a meeting at his house, where, according to Adams, Dunson had lived with Adams's family. Dunson's bedroom, they discovered, was at the top of a steep flight of stairs, and his possessions were surprisingly few: the room contained a musty-smelling bed, two hospital night-gowns, and a pair of high-top tennis shoes. A search of the bathroom downstairs revealed no medications for Dunson, though he had a history of medical problems. The officers questioned Adams further, discovering that Dunson continued to receive Social Security and pension checks, and that Adams's practice was to deposit the money in his own account after Dunson signed the checks.

These circumstances, taken together, appeared highly suspicious, and Adams was indicted on twenty-five counts of theft of public funds, in violation of 18 U.S.C. § 641–one count for each allegedly stolen Social Security check, beginning in May of 1996–and twenty-five counts of forgery of an obligation of the United States, in violation of 18 U.S.C. § 471.

* The Honorable David M. Lawson, United States District Judge, Eastern District of   Michigan, sitting by designation.

At trial, the evidence against Adams included the following: the suspicious convergence of the letter from the Social Security Administration and the report of Dunson's disappearance; Adams's unconcerned attitude during the search; Dunson's few possessions in the house, the unlived-in appearance of his room, and the absence of medication; the testimony of one of Adams's sons, who visited the Adams's house regularly and who had lived in Dunson's bedroom for two months in 1988, that he had never seen Dunson nor had he even heard of him until he was reported missing; the testimony of six of Adams's neighbors that they had never seen an elderly man at Adams's house; the testimony of three members of the church Dunson had attended that they had not seen him at church since 1980, though the pastor may have seen him in 1985; the testimony of Adams's landlord that during Adams's eighteen-year stay in the residence, he had not known of an elderly man living there; medical records indicating that Dunson had in 1980 been hospitalized three times with serious medical problems, including organic brain syndrome or dementia and possibly a stroke, but that he had not been hospitalized since; expert medical testimony that in 1980 the life expectancy of a seventy-five-year-old black male would have been around eight years; and the simple fact that Dunson's whereabouts remained a mystery.

The evidence in Adams's favor was considerably less extensive. It included the testimony of Adams and his wife that Dunson had lived with them until his 1996 disappearance; the testimony of a young man who worked in the Over–the–Rhine neighborhood that on the day of Dunson's disappearance he had seen a disoriented old man wandering around; the testimony of Dunson's pastor that he may have seen Dunson as late as 1985 (which weighed against the government's theory that he had died in 1980); and the fact that the government, unable to find an example of Dunson's handwriting for comparison, produced no evidence that Adams had forged Dunson's signature.

At the conclusion of the trial, the jury found Adams guilty of the twenty-five counts of theft of public funds, but acquitted him of the forgery charges. The district court found by a preponderance of the evidence that Dunson would not have survived beyond the end of 1985; the court used that date to calculate the amount of loss to the government as a result of the theft, including as relevant conduct Adams's cashing of Dunson's Social Security checks from 1986 until the May 1996 date in the indictment. The court sentenced Adams to twenty-seven months in prison, three years of supervised release, $129,853 in restitution, and a special assessment of $1,000.

## I. Sufficiency of the Evidence

■ Adams first alleges that the evidence was insufficient. For this court, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Layne*, 192 F.3d 556, 567 (6th Cir.1999) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Specifically, the question is whether a rational jury could have found beyond a reasonable doubt each element of the crime: (1) that Adams stole or converted to his own use money or a thing of value; (2) that the money or thing of value was a money or a thing of the United States or one of its departments or agencies; (3) that the money or thing of value was valued at more than $1,000; and (4) that Adams acted willfully and knowingly.

*United States v. McGahee,* 257 F.3d 520, 528–29 (6th Cir.2001).

We conclude that a rational jury could have done so. Regarding the first element, Adams does not dispute that he deposited Dunson's checks into his own account, and the question is rather whether Dunson was alive at the time. The government presented persuasive evidence at trial that Dunson had not lived with Adams since at least 1986, and we conclude that a rational jury could have found that Dunson had died or left Adams's care before 1986. Regarding the other three elements, we reach the same conclusion: the checks Adams cashed were, for reasons discussed below, the property of the United States; it is undisputed that more than $1,000 was involved; and the weight of the evidence was sufficient for a jury to find that Adams intended to do what he did.

## II. Whether the Checks Were the Property of the United States

■ Adams argues that, as a matter of law subject to de novo review, the district court erred when it concluded that Social Security checks that have been mailed through the United States Postal Service are "money ... of the United States." Though he admits that this Circuit held in *Clark v. United States,* 268 F. 329 (6th Cir.1920) that un-mailed United States checks are government property, he nevertheless argues that this Circuit should hold that where the checks are purloined *after* they have passed through the Postal Service, they no longer belong to the United States. His only argument in favor of this unlikely conclusion is that "[t]he government does not have control over the check after it has been sent and delivered[.]" We find this a distinction without a difference: because the United States' underlying obligation to its payee is not dis-

charged until the payee receives the funds, "[t]he delivery of a check is at best of limited functional significance." *United States v. Forcellati,* 610 F.2d 25, 31 (1st Cir.1979). We agree with those circuits that have held that the United States retains a property interest in its checks, even after they have passed through the mails, and conclude that Adams's claim to the contrary is meritless.

## III. The Proper Starting–Point for Calculating the Extent of the Theft

■ Adams argues that the district court incorrectly chose the end of 1985 as the date when Dunson died, and that the court thus improperly settled on 1986 as the start-date for calculating the extent of Adams's thefts. The distinction in dates is significant because it affects both Adams's sentence of restitution and his sentence of incarceration. In Adams's view, the court should have used May of 1996–the starting date alleged in the indictment–as the beginning point, because the judge's finding that Dunson died in 1985 was not supported by a preponderance of the evidence, and because the judge should have applied the rule of lenity.

We may not overturn the district court's use of the 1985 date unless the district court was clearly erroneous in finding, based on a preponderance of the evidence, that Dunson had died by the end of 1985. 18 U.S.C. § 3742(e). We find no such error.

The evidence presented at trial supports the district court's conclusion, and even suggests that the court was lenient in choosing 1986 over 1981. The only evidence that Dunson may have lived beyond 1980 was his pastor's statement that "I'm not sure exactly when was the last time [I saw Dunson], but it had to be before 1986 that I can recall seeing him." This hardly

amounts to a positive statement that he saw Dunson in 1985, and by choosing 1986 as the start-date, the district court gave Adams the benefit of the doubt. We decline Adams's invitation to disturb that finding.

### IV. The Calculation of Adams's Criminal History in Sentencing

■ Adams does not argue that the district court miscalculated his sentence, but rather that his history merited a downward departure. In 1993–after Dunson presumably had died, and while Adams was cashing Dunson's Social Security checks–Adams was convicted for possessing a firearm in a motor vehicle and received two months in jail and two years' probation. This prior offense, because it was committed while he was committing his Social Security thefts, gave him five criminal history points under the Sentencing Guidelines. Though the district court chose to reduce those criminal history points to four, Adams nevertheless remained in criminal history category III. Because his base offense level was fifteen, Adams's guideline range was twenty-four to thirty months–as opposed to a range of twenty-one to twenty-seven months had he been in category II. (As noted above, he in fact received a sentence of twenty-seven months.)

Adams argues that a criminal history category of III unfairly over-represents his actual criminal history, both because the single firearms offense is not so serious as other offenses that category III offenders typically have committed, and because two of the points for that offense attached only because of the early relevant conduct date chosen by the court. Adams complains that the district court therefore ought to have departed downward. Though Adams acknowledges that a district court's decision not to depart down-ward is reviewable on appeal only if the court erroneously believed that as a matter of law it lacked discretion to do so, *United States v. Cook*, 238 F.3d 786, 790–91 (6th Cir.2001), he contends that the district court's four-word response to his request for a departure–"That will be denied"–indicates that the court did not realize it possessed discretion.

This court, in *United States v. Byrd*, 53 F.3d 144 (6th Cir.1995), adopted the view of several other circuits that "there is no duty on the trial judge to state affirmatively that he knows he possesses the power to make a downward departure, but declines to do so.... [A]n appellate court should be reluctant to 'treat as ambiguous' a ruling which does not affirmatively state that the judge knew he could depart downward but failed to do so." *Id.* at 145 (quoting *United States v. Barrera–Barron*, 996 F.2d 244, 246 (10th Cir.1993)). We have maintained that position consistently. *See, e.g., United States v. Smith*, 278 F.3d 605, 608 (6th Cir.2002); *United States v. Owusu*, 199 F.3d 329, 349 (6th Cir.2000); *United States v. Farrow*, 198 F.3d 179, 199 (6th Cir.1999). There is nothing in the record here that provides any indication that the sentencing judge was unaware of his discretion to depart downward. Adams's claim is wholly without merit.

### Conclusion

For the foregoing reasons, we AFFIRM the judgment and the sentence imposed by the district court.